**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> *ex rel.* VERITY INVESTIGATIONS, LLC, <br><br>         *Plaintiff/Relator*, <br><br>     v. <br><br> IMPERATIVE CHEMICAL PARTNERS, INC., <br><br> HASTINGS EQUITY PARTNERS, LLC <br><br><br>        *Defendants*. | Case No. 7:24-CV-160 <br><br> **THIRD AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.*** <br><br> **Jury Trial Demanded** |

1

**THIRD AMENDED *QUI TAM* COMPLAINT**

## I.    Introduction

1.    This is a *qui tam* case, filed on behalf of the federal government, seeking to recover $2 million (plus mandatory trebling) that Defendant Imperative Chemical Partners, Inc. wrongfully obtained in the form of a federal guaranteed loan by falsely certifying that (1) Imperative Chemical Partners, Inc. was "eligible to receive a loan under the rules in effect at the time";[1] (2) Imperative Chemical Partners, Inc. provided a "complete list" of its affiliates;[2] (3) Imperative Chemical Partners, Inc. and its affiliates collectively had at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020; [3] (4) Imperative Chemical Partners, Inc. and its affiliates collectively employed 300 people;[4] and (5) the loan was "necessary to support the ongoing operations of the" Defendant.[5] Defendant's loan was later forgiven, and the federal government paid the bill.

2.    The loan in question was provided by the Small Business Administration's ("SBA's") Paycheck Protection Program ("PPP"). The PPP was created by Congress near the start of the COVID-19 epidemic in the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") in 2020, and then received additional funding ($284 billion) in December 2020 in the "Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act."[6] 15 U.S.C. § 636(a)(37).

---

[1] TAB-0000162.
[2] IMPERATIVE-0000015.
[3] TAB-0000160.
[4] TAB-0000160.
[5] TAB-0000162.
[6] SBA INSPECTOR GENERAL INSPECTION REPORT, The Small Business Administration's Implementation of Recommended Controls and the Economic Aid Act (Aug. 12, 2021), https://www.sba.gov/sites/sbagov/files/2021-08/SBA%20OIG%20Report%2021-19.pdf.

3.      In early 2021, SBA authorized a second series of PPP loans, widely referred to as "Second Draw" PPP loans. This case involves a false application for a Second Draw PPP loan.

4.      The Second Draw PPP loans were made available only to "small" businesses. The SBA established a clear, bright-line rule for who counted as "small." Applicants were required to certify, in their application, that they (both the applicant and its affiliates) collectively employed 300 or fewer persons.[7]

5.      Applicants were also required to certify that they (both the applicant and its affiliates) had a 25% gross decline in gross receipts between comparable quarters in 2019 and 2020.

6.      Imperative falsely certified to the SBA that (1) Imperative was "eligible to receive a loan under the rules in effect at the time [the loan] application is submitted";[8] (2) Defendant provided "a complete list of entities affiliated with the" Defendant; [9] (3) Imperative and its affiliates collectively had 300 employees;[10] (4) Imperative and its affiliates collective had at least a 25% decline in gross receipts between comparable quarters in 2019 and 2020;[11] and (5) the loan was "necessary to support the ongoing operations of the" Defendant.[12] As a direct result of these false statements, Defendant obtained a Second Draw PPP loan of $2,000,000.00, which was later forgiven.

7.      Defendant Hastings Equity Partners, LLC ("Hastings")—the private equity parent company who controls Imperative Chemical Partners Inc. through a series of holding companies—

---

[7] SMALL BUSINESS ADMINISTRATION, Second Draw PPP loan, https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/second-draw-ppp-loan.
[8] TAB-0000162.
[9] IMPERATIVE-0000015.
[10] TAB-0000160.
[11] TAB-0000162.
[12] TAB-0000162.

directed Imperative Chemical Partners Inc. to apply for its Second Draw PPP loan. Hastings brought the Second Draw PPP loan opportunity to Imperative's attention, coordinated the data gathering for the loan application, reached out to lenders on Imperative's behalf, and served as the intermediary between Imperative and the lenders Imperative used to process the loan application. Hastings caused Imperative Chemical Partners Inc. to make false statements to the SBA.

8.     Relator is an outside investigative company that detected Defendant's fraud by reviewing the Forms 5500 that Defendant's employees' 401(k) plan filed with the Department of Labor. Those forms indicated that the 401(k) plan had more than 300 "active participants" in each of 2019 and 2020. Because an "active participant" is an employee, these forms' representations to the Department of Labor give the lie to Defendant's false statement to the SBA that it employed fewer than 300 persons.

9.     Relator also detected Defendant's fraud by reviewing Defendant's and its affiliates' reports, and other evidence about Defendant and its affiliates. That evidence demonstrates that Defendant falsely certified to the SBA that Defendant met the eligibility requirements for the Second Draw PPP loan Defendant obtained.

## II.    The Parties

10.     Plaintiff Verity Investigations LLC ("Relator") is an investigative firm formed by two professionals with widespread experience in detecting and reporting fraud on the U.S. public fisc.

11.     Defendant Imperative Chemical Partners, Inc. ("Imperative") is a Delaware corporation with its principal place of business in Midland, Texas.

12.     Defendant Hastings Equity Partners, LLC  is a Delaware limited liability company with its principal place of business in Boston, Massachusetts.

### III.    Jurisdiction and Venue

13.    This action arises under the laws of the United States to redress violations of the Federal False Claims Act, 31 U.S.C. §§ 3729–33 ("FCA").

14.    Subject-matter jurisdiction is conferred by 28 U.S.C. §§ 1331, 1345.

15.    Venue is proper, and this Court has personal jurisdiction over Imperative, because Imperative is "found" in this District. 31 U.S.C. § 3732(a).

### IV.    The False Claims Act

16.    The FCA is the primary civil remedial statute designed to deter fraud upon the United States. Its purpose is to "enhance the Government's ability to recover losses sustained as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (July 28, 1986).

17.    A defendant violates the FCA when the defendant "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

18.    Under the FCA, a claim includes a request for money. 31 U.S.C. § 3729(b)(2). A claim is "false or fraudulent" under the FCA if the entity or person submitting the claim was not entitled to payment.

19.    In 2009, Congress amended the FCA through the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21 (May 20, 2009), making a defendant liable under the FCA when the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

20.    Under the FCA, the terms "knowing" and "knowingly" mean that the defendant "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

5

21.     No proof of specific intent to defraud the Government is required to show that a defendant acted knowingly under the FCA. 31 U.S.C. § 3729(b)(1)(B).

22.     The terms "knowing," "knowingly," "knowledge," "knows," and "knew," as used in this Complaint, have the meaning ascribed to them by the FCA.

23.     The FCA defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

24.     The FCA broadly defines a "claim" as "any request or demand . . . for money or property" that: "(i) is presented to an officer, employee, or agent of the United States," or "(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

25.     The FCA imposes treble damages plus a civil penalty for each false claim. *See* 31 U.S.C. § 3729(a)(1).

26.     The minimum and maximum civil penalty amounts are adjusted for inflation each successive year under the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74, § 701, 129 Stat. 584, 599–601 (2015). *See* 28 C.F.R. § 85.5 (identifying applicable inflation adjustments on an annual basis); 31 U.S.C. § 3729(a)(1).

27.     As of February 12, 2024, courts must assess a civil penalty of no less than $13,946 and no more than $27,894 per claim for FCA violations that occurred after November 2, 2015. *See* 28 C.F.R. § 85.5 Table 1.

28.     False statements made in a loan application to a third-party lender qualify as "false claims" to the government where, as here, the loan is guaranteed by the federal government and the federal government later repays the lender. *See United States v. Van Oosterhout*, 96 F.3d 1491, 1494 (D.C. Cir. 1996).

## I.     NO "PUBLIC DISCLOSURE" AND RELATOR IS AN ORIGINAL SOURCE

29.     On information and belief, no "public disclosure" has been made of Imperative's false statement and fraud detailed herein. 31 U.S.C. § 3730(e)(4)(A).

30.     On information and belief, Imperative's fraudulent transactions have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or by the news media.

31.     Even if there had been a "public disclosure," that would not matter in this case because Relator is an "original source of the information" set forth in this complaint. 31 U.S.C. § 3730(e)(4)(A).

32.     Relator's knowledge is independent of and materially adds to any publicly disclosed aspects of the fraudulent transactions described herein. Among other things, Relator has "connected the dots" between (a) Imperative's Form 5500 disclosures, other statements, and Imperative's affiliate information, and (b) Imperative's false certifications for the Second Draw PPP loan.

33.     Prior to filing this action, Relator voluntarily provided the Government with this complaint and all material evidence in Relator's possession relating to the fraudulent transactions.

## V.     The Second Draw PPP Loan Program

34.     To be eligible for a Second Draw PPP loan, borrowers were required to meet three criteria: (1) have "[p]reviously received a First Draw PPP Loan," (2) "[have] no more than 300

employees," and (3) be able to "demonstrate at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020."[13] 15 U.S.C. § 636(a)(37)(A)(iv).

35.    The SBA's website explained each of these requirements to borrowers. This was explained in an overview page of the website[14] and in the online "Frequently Asked Questions" document available on the website.[15]

36.    The SBA's FAQ document stated that this limit was "narrower" than the prior 500-employee limit for the earlier First Draw PPP loans.[16]

37.    The SBA's FAQ document warned borrowers that, unlike with the First Draw PPP loans, "[a]pplicants may **_not_** use SBA's established size standards . . . or the alternative size standard to qualify for a Second Draw PPP Loan."[17]

38.    The SBA's FAQ stated that "borrowers" were "required to apply SBA's affiliation rules under 13 C.F.R. 121.301(f)."[18]

39.    That regulation—13 C.F.R. § 121.301(f)—stated that when counting "employees," an applicant must include the employees of "all of its domestic and foreign affiliates." 13 C.F.R. § 121.301(f)(6).[19]

---

[13] SMALL BUSINESS ADMINISTRATION, Second Draw PPP loan, https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/second-draw-ppp-loan.

[14] SMALL BUSINESS ADMINISTRATION, Second Draw PPP loan, https://perma.cc/R74F-68UQ?type=image (as of March 2021).

[15] SMALL BUSINESS ADMINISTRATION, FAQ for PPP Borrowers and Lenders, https://perma.cc/5Y8K-CR5Y (as of March 2021).

[16] SMALL BUSINESS ADMINISTRATION, FAQ for PPP Borrowers and Lenders, at 29, https://perma.cc/5Y8K-CR5Y.

[17] SMALL BUSINESS ADMINISTRATION, FAQ for PPP Borrowers and Lenders, at 29, https://perma.cc/5Y8K-CR5Y (emphasis in original).

[18] SMALL BUSINESS ADMINISTRATION, FAQ for PPP Borrowers and Lenders, at 3, https://perma.cc/5Y8K-CR5Y.

[19] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).

40.    That regulation stated that "[c]oncerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both." 13 C.F.R. § 121.301(f).[20]

41.    That regulation defined "affiliate" broadly.

    a.  Affiliation includes "affiliation based on ownership." "For determining affiliation based on equity ownership, a concern is an affiliate of an individual, concern, or entity that owns or has the power to control more than 50 percent of the concern's voting equity. If no individual, concern, or entity is found to control, SBA will deem the Board of Directors or President or Chief Executive Officer (CEO) (or other officers, managing members, or partners who control the management of the concern) to be in control of the concern. SBA will deem a minority shareholder to be in control, if that individual or entity has the ability, under the concern's charter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders." *See* 13 C.F.R. § 121.301(f)(1).[21]

    b.  Affiliation may also arise "under stock options, convertible securities, and agreements to merge." *See* 13 C.F.R. § 121.301(f)(2).[22]

    c.  Affiliation may arise "based on management:" "Affiliation arises where the CEO or President of the applicant concern (or other officers, managing members, or partners who control the management of the concern) also controls the management of one or more other concerns. Affiliation also arises where a single individual, concern, or entity that controls the Board of Directors or management of one

---

[20] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).
[21] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).
[22] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).

concern also controls the Board of Directors or management of one of more other concerns. Affiliation also arises where a single individual, concern or entity controls the management of the applicant concern through a management agreement." *See* 13 C.F.R. § 121.301(f)(3).[23]

 d. Affiliation may arise "based on identity of interest:" "Affiliation arises when there is an identity of interest between close relatives, as defined in 13 CFR 120.10, with identical or substantially identical business or economic interests (such as where the close relatives operate concerns in the same or similar industry in the same geographic area). Where SBA determines that interests should be aggregated, an individual or firm may rebut that determination with evidence showing that the interests deemed to be one are in fact separate." *See* 13 C.F.R. § 121.301(f)(4).[24]

 e. Affiliation may arise "based on franchise and license agreements:" "The restraints imposed on a franchisee or licensee by its franchise or license agreement generally will not be considered in determining whether the franchisor or licensor is affiliated with an applicant franchisee or licensee provided the applicant franchisee or licensee has the right to profit from its efforts and bears the risk of loss commensurate with ownership. SBA will only consider the franchise or license agreements of the applicant concern." *See* 13 C.F.R. § 121.301(f)(5).[25]

42. The SBA required borrowers to submit a Borrower Application Form (SBA Form 2483-SD) to a federally insured bank or similar credit institution, which would process the loan application and fund the loan.

---

[23] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).
[24] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).
[25] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).

10

43. SBA rules made clear that "[i]t is the responsibility of the **_borrower_** to determine which entities (if any) are its affiliates," and "**_[b]orrowers_** must apply the affiliation rules set forth in SBA's Interim Final Rule on Affiliation" and certify that they meet "the tests in SBA's alternative size standard, after applying the affiliation rules."[26]

44. The SBA Form 2483-SD required the applicant's authorized representative to certify that the applicant was "eligible to receive a loan under the rules in effect at the time this application is submitted."

45. The SBA Form 2483-SD required the applicant's authorized representative to certify that they "read" the Second Draw loan application instructions, "the Statements Required by Law and Executive Orders," and "the rules in effect at the time this application is submitted."

46. The SBA Form 2483-SD required the borrower to state the "Number of Employees (including affiliates, if applicable)."

47. The SBA Form 2483-SD required the applicant's authorized representative to certify eligibility by signing a statement that "[t]he Applicant, together with its affiliates (if applicable) . . . employs no more than 300 employees."

48. The SBA Form 2483-SD also required the applicant's authorized representative to initial to "certify that the information provided in this application . . . is true and accurate," and to acknowledge "that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000 . . . ."

---

[26] SMALL BUSINESS ADMINISTRATION, FAQ for PPP Borrowers and Lenders, at 3, https://perma.cc/5Y8K-CR5Y (emphasis in original) (emphasis added).

49.     The SBA guaranteed 100% of the outstanding balance of Defendant's Second Draw PPP loan. The guarantee was backed by the full faith and credit of the United States. 15 U.S.C. § 636(a)(2)(F).

## VI.    Defendant Falsely Certified to the SBA Its Compliance with the Second Draw PPP Loan Size Requirements

### A.    Background

#### 1.    Defendant Hastings Equity Partners LLC

50.     Defendant Hastings Equity Partners LLC ("Hastings") is a private equity firm, headquartered in Boston, MA.[27]

51.     Hastings can be validly served with process at 1209 Orange St., Wilmington, DE 19801.[28]

52.     In late 2013, Hastings formed Fund III, L.P. ("FUND III"), a Delaware limited partnership that operates as a private equity fund.[29]

53.     The website of Hastings lists its investment criteria, which includes "$20-200MM Revenue" and "$5-20MM EBITDA." [30]

54.     FUND III, and, in turn, Hastings, had a controlling stake in Imperative at the time of Imperative's Second Draw PPP loan application, and continues to hold a controlling stake in Imperative.

---

[27] Hastings Equity Partners, Contact, https://www.hastingsequity.com/contact.
[28] Delaware, Division of Corporations, Hastings Equity Partners LLC, https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx (for File No. 3632373)
[29] Fund                III                SEC                Filing, https://www.sec.gov/Archives/edgar/data/1587034/000090866213000275/xslFormDX01/primary_doc.xml; Delaware, Division of Corporations, Hastings Equity Fund III, L.P. (File No. 5392766) https://icis.corp.delaware.gov/ecorp/entitysearch/NameSearch.aspx.
[30] Hastings Equity Partners, Our Approach, https://www.hastingsequity.com/our-approach.

55.     At the time of Imperative's Second Draw loan application, Hasting owned a controlling stake in numerous companies, many of which Hastings continues to control today. These companies include, but are not limited to:

   a.   Reach Wireline LLC ("Reach")[31]

   b.   FloCap Injection Services LLC ("FloCap"); [32] and

   c.   Hybrid Tool Solutions LLC ("Hybrid").[33]

### B.      Defendant Imperative Chemical Partners, Inc.

56.     Upon information and belief, Defendant Imperative Chemical Partners, Inc. is a corporation registered in Delaware[34] and headquartered at 203 W. Wall Street, Midland, Texas 79701.[35]

57.     Imperative can be validly served with process at 1209 Orange St., Wilmington, DE 19801.[36]

58.     Imperative provides chemical services including production chemical, midstream chemicals, completion chemicals, capillary services, acid services, and hot oiling.[37]

---

[31]    PR   Newswire,   *Hastings   Announced   Investment   in   Reach   Wireline   LLC*, https://www.prnewswire.com/news-releases/hastings-announces-investment-in-reach-wireline-llc-300505488.html; https://mergr.com/transaction/edge-ofs-holdings-acquires-reach-wireline.

[32] PR Newswire, *Hastings Equity Partners Forms Largest Independent Chemical Company*, https://www.prnewswire.com/news-releases/hastings-equity-partners-forms-largest-independent-chemical-company-in-the-permian-basin-300738750.html

[33] PR Newswire, *Hastings Equity Partners LLC Acquires Hybrid Tool Solutions LLC*, https://www.prnewswire.com/news-releases/hastings-equity-partners-llc-acquires-hybrid-tool-solutions-llc-300153753.html.

[34]    Delaware,    Division    of    Corporations,    Imperative    Chemical    Partners,    Inc., https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx (for File No. 5481034).

[35]    Delaware,    Division    of    Corporations,    Imperative    Chemical    Partners,    Inc., https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx (for File No. 5481034); Imperative, https://www.imperativechemicals.com/; LinkedIn, Imperative Chemical Partners, Inc., https://www.linkedin.com/company/imperativechemicals/.

[36]    Delaware,    Division    of    Corporations,    Imperative    Chemical    Partners,    Inc., https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx (for File No. 5481034).

[37] Imperative, https://www.imperativechemicals.com/service/ (stating its services).

59.     Imperative was formed in October 2018 via the consolidation of WadeCo Specialties, Impact Chemical Technologies, and FloCap, all formerly acquired by FUND III and, in turn, Hastings.[38]

60.     FUND III, Hastings, and all entities in which FUND III and/or Hastings have a controlling interest (including the entities listed in ¶ 52, *supra*) qualify as Imperative's "affiliates" for purposes of the PPP Loan program under one or more of the alternative definitions provided in 13 C.F.R. § 121.301(f). [39]

### C.     Imperative's False Statements to Obtain Second Draw PPP Loan

61.     In 2020, Imperative submitted its Borrower Application form to apply for a First Draw PPP loan in the amount of $8,693,400.00.

62.     On or about August 3, 2021, after Imperative applied and was approved for a Second Draw PPP loan, the U.S. government forgave 100% of Imperative's First Draw PPP Loan, including interest, in the amount of $8,806,172.72.

63.     In 2021, Imperative submitted its Borrower Application form, SBA Form 2483-SD, to Transportation Alliance Bank, Inc. in Ogden, Utah to apply for a Second Draw PPP loan.

64.     On its Form 2483-SD, Imperative listed its address as 203 W. Wall St. N/A, Midland, Texas 79701-4530.

### 1.     Imperative's False Statement Regarding Eligibility for the Loan and Number of Employees

65.      Imperative certified, in its SBA Form 2483-SD, that Imperative was "eligible to receive a loan under the rules in effect at the time this application is submitted."[40]

---

[38] PR Newswire, *Hastings Equity Partners Forms Largest Independent Chemical Company*, https://www.prnewswire.com/news-releases/hastings-equity-partners-forms-largest-independent-chemical-company-in-the-permian-basin-300738750.html
[39] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).
[40] TAB-0000162.

66.    Imperative's SBA Form 2483-SD's representation that it was "eligible to receive" the Second Draw PPP loan was false. Imperative was ineligible for the Second Draw PPP loan because (1) Imperative and its affiliates collectively employed over 300 employees and (2) on information and belief, Imperative and its affiliates did not collectively have a 25% reduction in gross receipts between comparable quarters in 2019 and 2020. Each independently rendered Imperative ineligible for the Second Draw PPP loan.

67.    On its SBA Form 2483-SD, Imperative represented to the lender and to the U.S. government that it and its affiliates had 300 employees—exactly the 300-employee limit needed to be eligible to apply.[41]

68.    Imperative's SBA Form 2483-SD's representation regarding the total number of its and its affiliates' employees was false. Imperative and its affiliates had far more than 300 employees in each of 2019, 2020 and 2021.

69.    Imperative deliberately ignored the fact that the total number of its and its affiliates' employees numbered in excess of the 300-employee limit for obtaining a Second Draw PPP loan. Imperative signed its false SBA Form 2483-SD with knowledge of, or reckless disregard for, the truth.

---

[41] TAB-0000160.

### 2.    Imperative's False Statements Regarding Its Affiliates

70.    On information and belief, Imperative provided to the SBA, via an addendum to Imperative's Form 2483-SD, what Imperative purported was "a complete list of entities affiliated with the applicant."[42]

71.    On information and belief, in that addendum, Imperative certified to the SBA that Imperative prepared the "complete list of entities affiliated with the applicant" in "full consideration to the affiliation requirements."[43]

72.    Imperative's certification that Imperative provided SBA with "a complete list of entities affiliated with the applicant" was false. Imperative's "list of entities" did not include Hastings and many of the subsidiary companies Hastings controls.

73.    Imperative is "majority owned by Hastings."[44] Accordingly, Hastings "has the power to control" Imperative and is Imperative's affiliate. 13 C.F.R. § 121.301(f)(1).[45]

74.    As a private equity parent, Hastings "has the power to control both" Imperative and Hastings' other portfolio companies; therefore, Imperative and each of Hastings' investment companies "are affiliates of each other." 13 C.F.R. § 121.301(f)(1).[46]

75.    Imperative deliberately ignored the fact that Hastings, and the entities Hastings controls, are Imperative's affiliates. Imperative's certification that it provided "complete list of entities affiliated with the applicant" in "full consideration to the affiliation requirements" was made with knowledge of, or reckless disregard for, the truth.

---

[42] IMPERATIVE-0000015.
[43] IMPERATIVE-0000015.
[44] IMPERATIVE-0000012.
[45] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).
[46] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).

76.     Imperative did not aggregate its employee count, tangible net worth, gross receipts, or any financial information with its affiliates—in direct contravention of SBA rules and the loan application's instructions.

### 3.     Imperative's False Statements Regarding the Alternative Size Standard

77.     Imperative also certified, in its SBA Form 2483, that Imperative, "when considered with all affiliates, is a 'small business concern' as defined by the Small Business Administration using the 'alternative size standard.'" [47]

78.     Imperative's certification that it was qualified for the Second Draw PPP loan under the SBA's alternative size standard was false.

79.     The SBA's alternative size standard is not applicable to the Second Draw loan PPP.

80.     The statute Congress passed to create the Second Draw PPP omits any mention of the alternative size standard. *See* 15 U.S.C. § 636(a)(37)(A)(iv).

81.     The SBA's FAQs, available on the SBA website prior to Imperative's Second Draw loan application, explicitly forbid use of the alternative size standard for the Second Draw PPP.[48]

82.     Imperative acted with at least "deliberate ignorance" or "reckless disregard of the truth" when it falsely claimed eligibility for the Second Draw loan purportedly under the alternative size standard. 31 U.S.C. § 3729(b)(1).

83.     Imperative not only had an obligation to review the eligibility criteria, but Imperative also certified, in its SBA Form 2483-SD, that Imperative "read" the Second Draw loan

---

[47] IMPERATIVE-0000015.

[48] SMALL BUSINESS ADMINISTRATION, FAQ for PPP Borrowers and Lenders, at 29, https://perma.cc/5Y8K-CR5Y (emphasis in original).

application instructions, "the Statements Required by Law and Executive Orders," and "the rules in effect at the time this application is submitted." [49]

84.    Moreover, Imperative was expressly warned by lenders that the alternative size standard was not an acceptable method for Second Draw PPP Loan qualification. [50]

85.    Even if the alternative size standard were applicable to the Second Draw PPP, Imperative's certification to the SBA, in Imperative's addendum to its Form 2483-SD, that Imperative meets that standard "when considered with all affiliates" was still false. [51] Imperative does not meet the alternative size standard "when considered with all affiliates." *See infra* Section VI.D.

86.    On or about May 11, 2021, Imperative was approved for a Second Draw PPP loan in the amount of $2,000,000.00 by lender Transportation Alliance Bank, Inc.

87.    The U.S. government paid lender Transportation Alliance Bank, Inc. a lender's processing fee of 1% of the $2,000,000.00 loan, in the amount of $20,000.00. [52]

88.    On or about January 19, 2022, the U.S. government forgave 100% of Imperative's Second Draw PPP Loan, including interest, in the amount of $2,013,611.11.

**D.    Evidence of Imperative's Ineligibility for the Loan**

89.    Imperative was ineligible for the Second Draw PPP loan it obtained because Imperative employed over 300 people. *See* 15 U.S.C. § 636(a)(37)(A)(iv) (defining an "eligible entity" for the Second Draw PPP as one that "employs not more than 300 employees").

---

[49] TAB-0000162.
[50] IMPERATIVE-0000477.
[51] IMPERATIVE-0000015.
[52]    Paycheck    Protection    Program    (PPP)    Information    Sheet:    Lenders, https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf.

90.    On its Borrower Application form to apply for a First Draw PPP loan, Imperative represented to the lender and to the U.S. government that it and its affiliates had 480 employees—narrowly under the 500-employee limit needed to be eligible to apply for a First Draw PPP loan but greater than the 300-employee limit needed to be eligible to apply for a Second Draw PPP loan.

91.    Additionally, Imperative maintained a 401(k) retirement plan for its employees in each of 2019, 2020 and 2021 (the "Imperative Employee Benefits Plan").

92.    The Imperative Employee Benefits Plan was a "single employer" plan, meaning that it provided pension benefits solely to the employees of one employer.[53] That employer was Imperative.[54]

93.    In 2019, 2020, and 2021 the Imperative Employee Benefits Plan had the following legal name: Imperative Chemical Partners, Inc. 401K Plan.

94.    Each year, the Imperative Employee Benefits Plan was required to file a Form 5500 with the U.S. Department of Labor. That form required the Imperative Employee Benefits Plan to state the "number of active participants" at the beginning and end of the plan year. Form 5500 instructed Imperative that "active participants" are "individuals who are currently in employment covered by the plan and who are earning or retaining credited service under the plan."[55]

95.    In 2019, the Imperative Employee Benefits Plan reported 379 active participants at the start and 384 active participants at the end of the year.[56]

---

[53] The plan's Forms 5500 for 2019, 2020, and 2021 all check the box in section A attesting that it was "a single-employer plan."
[54] The plan's Forms 5500 for 2019, 2020, and 2021 all list the "employer" as "Imperative Chemical Partners, Inc." All three years' Forms 5500 also give the same Employer Identification Number. The address is listed as PO Box 60634, Midland, TX 79711.
[55] Instructions for Form 5500 (2021).
[56] Form 5500, Imperative Chemical Partners, Inc. (2019).

96.     In 2020, the Imperative Employee Benefits Plan reported 500 active participants at the start and 393 active participants at the end of the year.[57]

97.     In 2021, the Imperative Employee Benefits Plan reported 387 active participants at the start and 360 active participants at the end of the year.[58]

98.     Other databases also contradict the representation that Imperative made in its SBA Form 2483-SD that it and its affiliates only had 300 employees. For instance, as of March 5, 2024, D&B Hoovers reports that Imperative had 450 total employees.[59] As of March 13, 2024, LinkedIn categorized Imperative as having "501-1000 employees."[60] As of March 18, 2024, ZoomInfo reported Imperative as having "595 employees"[61] and Zippia reported Imperative as having 750 employees.[62]

99.     On information and belief, Imperative's payroll records from 2019, 2020, and 2021 will confirm what Imperative always knew—that it and its affiliates collectively employed well over 300 employees throughout the time period 2019–2021.

**E.      Evidence of Ineligibility under the Alternative Size Standard**

100.    Imperative did not qualify for the Second Draw PPP under the alternative size standard because that standard was inapplicable to the Second Draw PPP, *see supra* Section VI.B.3.

---

[57] Form 5500, Imperative Chemical Partners, Inc. (2020).

[58] Form 5500, Imperative Chemical Partners, Inc. (2021).

[59] D&B Hoovers, Imperative Chemical Partners, Inc. (last visited March 5, 2024); *see also id.* (explaining that D&B Hoover's reported count of "actual employees" is "[t]he sum of individuals employed at a parent or headquarter location and all locations that roll up into it, or attributed to an organization which is a single location, as reported on an official financial statement or reported by a government institution").

[60] LinkedIn, Imperative Chemical Partners, Inc., https://www.linkedin.com/company/imperativechemicals/.

[61] ZoomInfo, Imperative, https://www.zoominfo.com/pic/imperative/470968338.

[62] Zippia, Imperative Chemical Partners, https://www.zippia.com/imperative-chemical-partners-careers-2128351/.

101.    Even if the alternative size standard were applicable to the Second Draw PPP, Imperative still falsely certified that Imperative met that standard.

102.    The SBA's alternative size standard required applicants to show that they and their affiliates had both (i) tangible net worth of not more than $15 million, and (ii) average net income of less than $5 million for the two fiscal years before the date of the applicant's PPP loan application.

103.    Imperative did not aggregate the tangible net worth or average net income of all its affiliates when certifying Imperative's eligibility under the alternative size standard.

104.    According to Hastings' investment criteria listed on its website, Hastings seeks to acquire majority interests in companies actively generating between "$5–20MM EBITDA" and "$20-200MM Revenue."[63]

105.    Because Hastings acquired a majority interest in each of Imperative, Reach, FloCap, and Hybrid, Imperative and these Imperative affiliates are expected to have collectively generated $15–60MM of EBITDA and $60–600MM of revenue in 2018 and 2019. This implies that Imperative and its affiliates collectively had an average net income well over $5 million for the two fiscal years before the date of Imperative's PPP loan application.

106.    Given this estimated collective average net income, Imperative falsely certified that it was eligible under the alternative size standard "when considered with all affiliates."[64]

107.    On information and belief, Imperative's, Hastings', and Imperative's other affiliates' financial records from 2019, 2020, and 2021 will confirm what Imperative always knew—that Imperative and its affiliates collectively had tangible net worth well over $15 million,

---

[63] Hastings Website, *Our Investment Criteria*, https://www.hastingsequity.com/our-approach.
[64] IMPERATIVE-0000015.

and average net income of well over $5 million in the time applicable to Imperative's Second Draw loan application. Each would have independently rendered Imperative ineligible under the alternative size standard.

**F.     Evidence of Imperative's Lack of Economic Need for the Loan**

108.    Imperative certified in its SBA Form 2483-SD that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."[65]

109.    The SBA's FAQ document stated that "[b]orrowers must make this certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business."[66]

110.    Imperative's parent, Hastings, had significant sources of liquidity at the time of Imperative's Second Draw loan application.

111.    Imperative's parent announced an investment in another company a month before Imperative's Second Draw loan application.[67]

112.     The liquidity of Imperative's parent gives the lie to Imperative's false statement that the PPP loan was necessary to support Imperative's operations.

---

[65] TAB-0000162.

[66] SMALL BUSINESS ADMINISTRATION, FAQ for PPP Borrowers and Lenders at 11 (as of April  23, 2020),          https://www.sba.gov/sites/default/files/2023-03/Paycheck-Protection-Program-Frequently-Asked-Questions_04%2023%2020.pdf.

[67] PR Newswire, *Hastings Invests in Celerity Consulting Group*,
 https://www.prnewswire.com/news-releases/hastings-invests-in-celerity-consulting-group-301332535.html

### G.     Evidence of Hastings Causing Imperative to Submit False Claims

#### 1.     At all Relevant Times, Hastings Exercised Control Over Imperative

113.    Hastings exercised control over Imperative at the time of Imperative's Second Draw loan application.

114.    At least three Hastings personnel sat on the Board of Directors of Imperative's holding company: Joe Conlon (managing director at Hastings), Ted Patton (managing director at Hastings), and Marco Rodriguez (principal at Hastings).

115.    Ted Patton was—and remains as of today—the Imperative Board of Directors' chairman.

116.    During the time Imperative applied for its Second Draw loan, Hastings also monitored Imperative, periodically reviewed Imperative's financial statements, reviewed and approved Imperative's budget, and reviewed and approved all of Imperative's major decisions, including Imperative's decision to apply for the Second Draw PPP loan.

117.    Hastings also had the power to appoint Imperative's officers.

#### 2.     Hastings Took an Active Role in Imperative Second Draw Loan Application

118.    Hastings coordinated Imperative's loan application strategy, directed Imperative to apply for its Second Draw PPP loan, and consulted with Imperative regarding the information to report to the SBA in connection with Imperative's loan application and loan forgiveness application.

119.    Hastings brought the Second Draw loan application to Imperative's attention the week applications opened, reached out to two lenders on behalf of Imperative, and coordinated the data gathering for Imperative's loan application.

120.    Hastings also served as the intermediary between Imperative and the lender Imperative used to process Imperative's Second Draw PPP loan application and forgiveness application.

### 3.    Hastings Provided Imperative with False Information for Imperative to Present to SBA

121.    Hastings caused Imperative to falsely certify that Imperative was qualified for the Second Draw PPP under the alternative size standard. Hastings did so knowingly.

122.    PNC Bank told Imperative three times that Imperative was ineligible for the Second Draw PPP loan before Imperative submitted an application to TAB Bank.

123.    Hastings was copied on each of the PNC Bank communications.

124.    Hastings corresponded with PNC Bank to try to convince PNC Bank to approve Imperative's PPP loan despite the lender's warnings of Imperative's ineligibility.

125.    On the same day that PNC Bank issued its third warning to Imperative and Hastings, Hastings personnel directed that Imperative should nevertheless apply for the Second Draw loan and proceed with TAB Bank as Imperative's lender instead.

126.    Thus, Hastings acted with at least "deliberate ignorance" or "reckless disregard of the truth" when Hastings caused Imperative to make the false certification about Imperative's eligibility for the Second Draw PPP under the alternate size standard. 31 U.S.C. § 3729(b)(1).

127.    Hastings caused Imperative to report false information about Imperative's and its affiliates' tangible net worth and average net income in connection with Imperative's certification to the SBA that Imperative qualified for the Second Draw loan under the SBA's alternate size standard.  Hastings did so knowingly.

128.    Imperative relied on Hastings to make the financial aggregation and determination of affiliates as part of Imperative's Second Draw PPP loan application.

24

129. Imperative chose to rely on Hastings to make the calculation under the alternate size standard because Imperative did not have access to Hastings' portfolio companies' financial information in order to make that calculation itself. Imperative was not privy to the corporate structure of Hastings and could not, on its own, determine Imperative's own affiliates.

130. Hastings provided Imperative a list purporting to be a "complete list of" Imperative's affiliates but was in fact an incomplete list. Thus, Hastings caused Imperative to falsely certify that Imperative disclosed to SBA a "complete list of" Imperative's affiliates. Hastings did so knowingly.

131. Although it was Imperative's responsibility to verify the accuracy of the list Hastings provided, Imperative did not fully do so.

### FIRST CAUSE OF ACTION

**Submitting False Claims for Payment**
**31 U.S.C. § 3729(a)(1)(A)**
**Against All Defendants**

132. Relator repeats, realleges, and incorporates the allegations set forth in the paragraphs above as though fully set forth herein.

133. Defendants violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting and/or causing to be presented to the lender a claim for approval of a Second Draw PPP loan.

134. Imperative's knowingly false claims on its SBA Form 2483-SD, and addendum thereto, were material to the lender's decision to issue the Second Draw PPP loan and were material to the SBA's decision to forgive that loan and repay the lender.

135. But for Imperative's knowingly false claims, the lender would not have issued the loan and the SBA would not have forgiven it.

136. The Second Draw PPP loan that Imperative obtained was money that was intended by the Government to be spent or used to advance the Government's program and interest in assisting qualified and eligible small businesses to survive the COVID-19 epidemic and to continue to employ their workers.

137. The Second Draw PPP loan that Imperative obtained was money that the Government effectively and in practice provided to the lender, by means of the Government's 100% guarantee to the lender of repayment by the Government in the case of default by the borrower.

138. The Government later reimbursed the lender 100% of the amount of Imperative's Second Draw PPP loan, with interest.

139. Hastings caused Imperative to make the false certifications. Hastings did so knowingly.

140. At all relevant times, Hastings exercised control over Imperative, including through holding controlling equity in Imperative, through an asset management agreement, through Hastings executives sitting on Imperative's board of directors, and/or through Hastings having the power to appoint Imperative officers and directors.

141. Hastings issued to Imperative directives relating to the Second Draw PPP Loan Imperative obtained.

142. Hastings caused Imperative to submit Imperative's fraudulent applications for a Second Draw PPP loan and Second Draw PPP loan forgiveness.

143. Hastings connected Imperative with a lender to process Imperative's Second Draw PPP loan application.

144.    Hastings had actual knowledge of the truth, or at minimum acted with deliberate indifferent or reckless disregard for the truth—that Imperative was not eligible for the Second Draw PPP loan Imperative obtained and received forgiveness of.

145.    Hastings' knowledge is established by, among other things, its being warned by lending institutions that Imperative was not eligible for the Second Draw PPP loan Imperative applied for and obtained.

146.    Imperative's false claims, caused by Hastings, were material to the lenders' decisions to issue the loans and were material to the SBA's decisions to forgive the loan and repay the lender.

**SECOND CAUSE OF ACTION**

**Creating a False Record or Statement Material to a False Claim**
**31 U.S.C. § 3729(a)(1)(B)**
**Against All Defendants**

147.    Relator repeats, realleges, and incorporates the allegations set forth in the paragraphs above as though fully set forth herein.

148.    Defendants violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making or causing to be made false records and statements—namely, Imperative's SBA Form 2483-SD and its included certifications and addendum—to support a false claim submitted to the lender for approval of Second Draw PPP loan.

149.    Imperative's knowingly false records and statements were material to the lender's decision to issue the Second Draw PPP loan and were material to the SBA's decision to forgive that loan and repay the lender.

150.    But for Imperative's knowingly false records and statements, the lender would not have issued the loan and the SBA would not have forgiven it.

27

151.    Hastings caused Imperative to make the false certifications. Hastings created certain of the false certifications Imperative made, including creating a list purporting to be a "complete list of" Imperative's affiliates, which was in fact an incomplete list.  Hastings did so knowingly.

152.    At all relevant times, Hastings exercised control over Imperative, including through holding controlling equity in Imperative, through an asset management agreement, through Hastings executives sitting on Imperative's board of directors, and/or through Hastings having the power to appoint Imperative officers and directors.

153.    Hastings issued to Imperative directives relating to the Second Draw PPP Loan Imperative obtained.

154.    Hastings caused Imperative to submit Imperative's fraudulent applications for a Second Draw PPP loan and Second Draw PPP loan forgiveness.

155.    Hastings connected Imperative with a lender to process Imperative's Second Draw PPP loan application.

156.    Hastings had actual knowledge of the truth, or at minimum acted with deliberate indifferent or reckless disregard for the truth—that Imperative was not eligible for the Second Draw PPP loan Imperative obtained and received forgiveness of.

157.    Hastings' knowledge is established by, among other things, its being warned by lending institutions that Imperative was not eligible for the Second Draw PPP loan Imperative applied for and obtained.

158.    Imperative's false claims, caused by Hastings, were material to the lenders' decisions to issue the loans and were material to the SBA's decisions to forgive the loan and repay the lender.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator requests judgment against Defendants for: (i) three times the amount of damages that the United States has sustained (including the full amount of the forgiven Second Draw PPP loan and interest thereon, plus all processing fees paid by the Government); (ii) the maximum civil penalties allowed by law; (iii) an award to Relator for the maximum allowed under 31 U.S.C. § 3730(d); (iv) an award of attorney's fees, costs, and expenses; (v) interest as provided by law; and (vi) any other relief that this Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: April 3, 2026                                  Respectfully submitted,

Steven M. Shepard
Steven Shackelford, Jr. (*pro hac vice*)
Shauli Bar-On (*pro hac vice*)
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sshepard@susmangodfrey.com
sshackelford@susmangodfrey.com
sbar-on@susmangodfrey.com

*Attorneys for Relator Verity Investigations, LLC*

29

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 3, 2026 a copy of this document was served via CM/ECF upon all counsel of record when it was attached to Plaintiff/Relator's Motion for Leave to File Third Amended Complaint.

    /s/ *Shauli Bar-On*    
Shauli Bar-On
