**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* VERITY INVESTIGATIONS, LLC,<br><br>    *Plaintiff/Relator*,<br><br>    v.<br><br>IMPERATIVE CHEMICAL PARTNERS, INC.,<br><br>HASTINGS EQUITY PARTNERS, LLC,<br><br>    *Defendants*. | Civil Action No. 7:24-CV-160<br><br>JURY TRIAL DEMANDED |

**VERITY INVESTIGATIONS, LLC'S OPPOSITION TO HASTINGS EQUITY
<u>PARTNERS, LLC'S MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 4

    I.     About Defendants .......................................................................................... 4

    II.    About the Second Draw PPP ........................................................................ 4

    III.   Overview of the Complaint's Allegations Regarding Hastings............................ 7

ARGUMENT ................................................................................................................... 8

    I.     The Government Has Article III Standing to Recover the Fraudulently
         Obtained Taxpayer Money ........................................................................... 8

    II.    The Complaint Adequately Pleads the Challenged Elements of a False
         Claims Act Claim........................................................................................ 11

         A.    The Complaint Adequately Pleads Materiality........................................ 11

         B.    The Complaint Adequately Pleads Causation............................................ 17

    III.   The Complaint Satisfies Rule 9(b)............................................................ 22

         A.    Applicable Law....................................................................................... 22

         B.    Application.............................................................................................. 23

    IV.   The Government's Opposition to the Public Disclosure Bar Forecloses
         Hastings' Arguments .................................................................................. 29

    V.    If Any Pleading Deficiencies Exist, Dismissal Should Be Without
         Prejudice .................................................................................................... 30

CONCLUSION............................................................................................................ 30

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n of Cmty. Organizations for Reform Now v. Fowler*,
    178 F.3d 350 (5th Cir. 1999) ...........................................................................8, 9

*Brunswick Bank & Trust Co. v. United States*,
    707 F.2d 1355 (Fed. Cir. 1983)......................................................................20, 21

*Dammon v. Folse*,
    846 F. Supp. 36 (E.D. La. 1994).....................................................................13, 19

*Hart v. Bayer Corp.*,
    199 F.3d 239 (5th Cir. 2000) ...............................................................................29

*Hickson v. St. David's Healthcare P'ship, L.P., L.L.P.*,
    168 F.4th 282 (5th Cir. 2026) ..............................................................................29

*Lozada-Leoni v. MoneyGram International, Inc.*,
    2020 WL 7000874 (E.D. Tex. Oct. 19, 2020) .....................................................24

*Texas Carpenters Health Benefit Fund v. Philip Morris, Inc.*,
    21 F. Supp. 2d 664 (E.D. Tex. 1998 .....................................................................20

*Turaani v. Wray*,
    988 F.3d 313 (6th Cir. 2021) ........................................................................10, 20

*U.S. ex rel. Longhi v. United States*,
    575 F.3d 458 (5th Cir. 2009) .................................................................11, 16, 17

*United States ex rel. Bachert v. Triple Canopy, Inc.*,
    321 F. Supp. 3d 613 (E.D. Va. 2018) ...................................................................15

*United States ex rel. Bonzani v. United Technologies Corp.*,
    662 F. Supp. 3d 217 (D. Conn. 2023)...................................................................15

*United States ex rel. Campbell v. KIC Dev., LLC*,
    2019 WL 6884485 (W.D. Tex. Dec. 10, 2019) ..............................................12, 14

*United States ex rel. Collins v. Robertson*,
    2025 WL 2701061 (N.D. Ga. Aug. 18, 2025) ...................................................9, 10

*United States ex rel. Gomez v. Koman Constr., LLC*,
    796 F. Supp. 3d 353 (W.D. Tex. 2025)......................................................11, 22, 24

*United States ex rel. Grubbs v. Kanneganti*,
  565 F.3d 180 (5th Cir. 2009) ........................................................................22, 23, 24

*United States ex rel. Harman v. Trinity Indus. Inc.*,
  872 F.3d 645 (5th Cir. 2017) ....................................................................................12, 14

*United States ex rel. Hopper v. Anton*,
  91 F.3d 1261 (9th Cir. 1996) ....................................................................................21

*United States ex rel. Lam v. Tenet Healthcare Corp.*,
  481 F. Supp. 2d 689 (W.D. Tex. 2007)....................................................................22, 23

*United States ex rel. Lemon v. Nurses To Go, Inc.*,
  924 F.3d 155 (5th Cir. 2019) ....................................................................................11, 12

*United States ex rel. Owens v. First Kuwaiti General Trading & Contracting Co*,
  612 F.3d 724 (4th Cir. 2010) ....................................................................................21

*United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*,
  892 F.3d 822 (6th Cir. 2018) ....................................................................................16

*United States ex rel. Relator LLC v. Riviera Financial LLC*,
  2025 WL 1421265 (C.D. Cal. Feb. 6, 2025)..........................................................9, 10

*United States v. Corp. Mgmt., Inc.*,
  78 F.4th 727 (5th Cir. 2023) ....................................................................................16, 18

*United States v. Hodge*,
  933 F.3d 468 (5th Cir. 2019) ....................................................................................16, 17

*United States v. Marlin Med. Sols. LLC*,
  579 F. Supp. 3d 876 (W.D. Tex. 2022)....................................................................11

*United States v. McNinch*,
  356 U.S. 595 (1958)....................................................................................................10

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
  579 U.S. 176 (2016)............................................................................................ *passim*

**Statutes**

15 U.S.C. § 632(a)(5)(B) ....................................................................................................6

15 U.S.C. § 636(a) ................................................................................................ *passim*

31 U.S.C. § 3729(b)(4) ....................................................................................................11

31 U.S.C. § 3730................................................................................................................8, 29

iii

**Rules**

Fed. R. Civ. P. 9(b) ..........................................................................................................22

**Regulations**

13 C.F.R. § 121.201 .............................................................................................................5

85 Fed. Reg. 33,004, 33,005 (June 1, 2020) ...................................................................13

85 Fed. Reg. 33,004, at 33,005 (June 1, 2020) ...............................................................18

*Business Loan Program Temporary Changes; Paycheck Protection Program
    Second Draw Loans*, 86 Fed. Reg. 3712-01, 3713 .....................................................6

*Establishing the Task Force To Eliminate Fraud*, 91 Fed. Reg. 13485 (Mar. 15,
    2026) .............................................................................................................................21

**Other Authorities**

SBA Procedural Notice No. 5000-20078 (Jan. 15, 2021).........................................13, 18

## INTRODUCTION

***"I would rather get the cash and deal with it later[.]"***[1] That is what Joe Conlon—a Managing Director of Defendant Hastings Equity Partners, LLC[2]—wrote when asked whether Hastings' portfolio company (Defendant Imperative Chemical Partners, Inc.) should submit a Second Draw Paycheck Protection Program loan application, despite receiving *three* explicit warnings that Imperative was ineligible.

Hastings got the cash. Now it must deal with "later."

Hastings orchestrated a scheme to fraudulently obtain—and have forgiven—a $2 million PPP loan for its portfolio company, Imperative. After receiving *three separate warnings* from a third-party lender that Imperative was ineligible for the Second Draw loan, Hastings and Imperative abandoned that bank and shopped for a more compliant lender. Hastings then created a false document that concealed Imperative's true affiliates and directed Imperative to submit a loan application, riddled with false certifications, to the SBA. The loan was approved and forgiven in full—with interest—and the federal government paid the bill.

Although Hastings was only added to this case as a defendant recently, Hastings is no stranger to these claims. After refusing to produce clearly relevant documents and losing a motion to compel (ECF Nos. 46, 48, 54, 59), and then having Imperative carry its water by trying (unsuccessfully) to prevent Verity from naming Hastings as a defendant (ECF Nos. 63, 65, 67, 69), Hastings now moves to dismiss, asking this Court to believe it had nothing to do with

---

[1] Ex. 10, IMPERATIVE-001626.
[2] This brief uses the following shorthand terms:
"Hastings" refers to Defendant Hastings Equity Partners, LLC;
"Imperative" refers to Defendant Imperative Chemical Partners, Inc.;
"Verity" refers to Relator Verity Investigations, LLC;
"SBA" refers to the United States Small Business Administration; and
"PPP" refers to the Paycheck Protection Program administered by the SBA.

1

Imperative's fraud. The Complaint says otherwise.[3] And the discovery already taken confirms its allegations.

Hastings advances five arguments in support of its Motion to Dismiss. ECF No. 83 ("**Mot.**"). None has merit.

*First*, Hastings argues that because Imperative's loan *forgiveness* application disclosed the company's actual employee count as of the date of the original loan application, the government's primary loss (forgiveness of the fraudulently obtained loan with interest) is not fairly traceable to false statements in Imperative's loan application. Therefore, Hastings argues, the government lacks Article III standing to seek recovery of the full forgiven loan amount. Mot. at 7–8.

*Second*, citing the same disclosure in the loan forgiveness application, Hastings contends that the Complaint fails to plead materiality because Imperative's loan forgiveness application "disproves materiality." Mot. at 17.

*Third*, yet again citing the same disclosure in the loan forgiveness application, Hastings argues that the loan forgiveness application likewise "disproves the essential elements of causation." Mot. at 12.

These first three arguments all rest on the same premise: that because Imperative's loan forgiveness application disclosed its actual employee count and the government nevertheless forgave the loan, the false employee count on the original PPP loan application could not have been material and could not have caused the government's loss. Mot. at 6–7, 12–13, 17–18.

That premise fails for multiple reasons. Most fundamentally, it ignores the numerous other false statements that Hastings caused to be submitted in Imperative's PPP loan application, including false representations regarding Imperative's eligibility, affiliations, gross receipts, and

---

[3] All references to the Complaint are to the operative Third Amended Complaint, ECF No. 70 ("Cmplt.").

economic necessity. Each of those misrepresentations were threshold loan eligibility requirements, and Hastings does not even try to argue that they were disclosed to the government in the loan forgiveness application (or otherwise). Those independently actionable misrepresentations therefore remain untouched by the theory behind Hastings' first three arguments for dismissal.

Yet even if this case involved *only one* false statement—the falsified employee count in the loan application—Hastings still could not prevail at the pleading stage. Nothing on the face of the Complaint or otherwise establishes that anyone in the government had "actual knowledge" of Imperative's true employee count and nevertheless chose, or had authority, to waive that *statutory eligibility requirement* for the loan applicant. *See* 15 U.S.C. § 636(a)(37)(A)(iv) (defining an "eligible entity" for the Second Draw PPP as one that "employs not more than 300 employees"). Hastings' argument depends on assumptions about the SBA's knowledge, decision-making, and authority that cannot be resolved on this record in a motion to dismiss.

Hastings' other arguments fare no better.

***Fourth***, Hastings argues that the Complaint fails to satisfy Rule 9(b) because it does not identify the specific Hastings employees who participated in the fraud or describe their specific roles. Mot. at 9. Hastings demands a level of specificity far beyond what Rule 9(b) requires and disregards the Complaint's detailed factual allegations. Although the specific Hastings employees who participated in the fraud will eventually be publicly identified when they testify at trial, Verity did not think Hastings would fault Verity for not publicly calling out those employees by name at the pleading stage. Nevertheless, since Hastings insists that Verity publicly identify the individuals involved, Argument Section III.B below sets forth the Complaint's more detailed factual underpinnings and identifies by name, based on the evidence available to date, who at Hastings orchestrated the fraudulent scheme, how they carried it out, and when they did so (including Mr.

3

Conlon, quoted above). Those additional facts can readily be incorporated by amendment if the Court concludes that any further particularity is warranted at this stage; amendment to add facts as to Hastings would be fair, as the operative complaint is the first to name Hastings as a defendant.

**Fifth**, Hastings invokes the public disclosure bar. That argument fails as a matter of law because the United States has expressly opposed its application. ECF No. 84. Under 31 U.S.C. § 3730(e)(4)(A), the government's opposition is dispositive.

## FACTUAL BACKGROUND

### I.    About Defendants

Hastings is a Boston-based private equity firm that manages investment funds focused on lower-middle-market businesses. Cmplt. ¶ 12. Hastings Equity Fund III, L.P. ("**Fund III**") is one of Hastings' investment vehicles. *Id.* ¶¶ 9, 52. Hastings exercises control over Fund III's operations and investment decisions. *Id.* ¶¶ 9, 52, 54.

Imperative is a Delaware corporation headquartered in Midland, Texas, that provides chemical and injection services to oil and gas producers. *Id*. ¶¶ 11, 56, 58.

Imperative was formed in October 2018 through the consolidation of three companies—WadeCo Specialties, Impact Chemical Technologies, and FloCap—each of which had previously been acquired by Fund III and, in turn, controlled by Hastings. *Id*. ¶¶ 59–60. Multiple Hastings executives—including Joe Conlon, Ted Patton, and Marco Rodriguez—sat on Imperative's Board of Directors between at least 2020 and 2021. *Id*. ¶¶ 9–11, 114–15, 140, 152; Ex. 1, Imperative Dep. 39:12–15, 40:16–41:1.

### II.    About the Second Draw PPP

The PPP was created by Congress in March 2020 through the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") to provide emergency relief to small businesses during the COVID-19 pandemic. Cmplt. ¶ 2. Loans issued under the PPP were 100% guaranteed by the

SBA and could be fully forgiven if borrowers used the proceeds primarily for payroll costs. *Id.* ¶ 49. In December 2020, Congress enacted the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, which authorized a second round of PPP funding—known as "Second Draw" loans. *Id.* ¶ 2; 15 U.S.C. § 636(a)(37).

Under the PPP, Congress delegated private lenders the authority to act in the government's place to provide the loans. 15 U.S.C. § 636(a)(36)(F)(ii). The SBA required borrowers to submit a Borrower Application Form (SBA Form 2483-SD) to the private lender, which would process the loan application and fund the loan. Cmplt. ¶ 42. The Form 2483-SD required the applicant's authorized representative to make multiple certifications, including that: (1) the applicant was "eligible to receive a loan under the rules in effect at the time this application is submitted"; (2) the applicant, "together with its affiliates (if applicable) . . . employs no more than 300 employees"; (3) the applicant had experienced "at least a 25% reduction in gross receipts" between comparable quarters in 2019 and 2020; (4) the loan was "necessary to support the ongoing operations" of the applicant; and (5) the applicant had read and understood "the Statements Required by Law and Executive Orders" and "the rules in effect at the time this application is submitted." *Id.* ¶¶ 1, 44–47 (citing Ex. 12, TAB-0000162). Applicants were also required to initial the Form to "certify that the information provided in this application . . . is true and accurate" and to acknowledge "that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law." *Id.* ¶ 48; Ex. 12, TAB-0000163.[4]

The eligibility criteria for First Draw and Second Draw PPP loans differed. One eligibility pathway[5] for *First Draw* loans was the "alternative size standard," which permitted eligibility if

---

[4] Lenders were entitled to rely on borrower certifications without independent verification. *See* Ex. 2, TAB Bank Dep. 300:16–301:25 330:9–331:15; Ex. 3, VERITY-0010242, 10255 (FAQs #4, 31).

[5] The two other eligibility pathways for First Draw loans, not relevant here, are: **(1)** the SBA's industry-specific "size standard," codified at 13 C.F.R. § 121.201 (effective Nov. 20, 2019 to May 1, 2022), which classifies an applicant

an entity and its affiliates had a "tangible net worth" not in excess of $15 million *and* "average net income after Federal income taxes" for the preceding two completed fiscal years not in excess of $5 million. 15 U.S.C. § 632(a)(5)(B); Ex. 3, VERITY-0010241 (FAQ #2).

Eligibility for *Second Draw* loans was narrower. Cmplt. ¶ 36. "To be eligible for a Second Draw PPP loan, borrowers were required to meet three criteria: (1) have '[p]reviously received a First Draw PPP Loan,' (2) '[have] no more than 300 employees,' and (3) be able to 'demonstrate at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020.' 15 U.S.C. § 636(a)(37)(A)(iv)." Cmplt. ¶ 34.

The "alternative size standard" that was available to qualify for First Draw loans was *not* available for Second Draw loans. The statute creating the Second Draw PPP omits any mention of the alternative size standard. *See* 15 U.S.C. § 636(a)(37)(A)(iv). More definitively, SBA FAQ #63—published on the SBA website on March 3, 2021, *before* Imperative submitted its ultimately-funded application—explicitly stated: "Applicants may **_not_** use SBA's established size standards (either revenue-based or employee-based) or the alternative size standard to qualify for a Second Draw PPP loan." Cmplt. ¶ 37; Ex. 3, VERITY-0010268 (FAQ #63).[6] The Second Draw Interim Final Rule, published by the SBA on January 14, 2021, reiterated that the 300-employee cap was a bright-line requirement with no alternative pathway to eligibility. *Business Loan Program Temporary Changes; Paycheck Protection Program Second Draw Loans*, 86 Fed. Reg. 3712-01, 3713 ("In general, the Economic Aid Act made the eligibility requirements for Second Draw PPP

---

based on the code that applies to the applicant's industry under the North American Industry Classification System; and **(2)** A 500-employee size standard. *Even if* an applicant were ineligible under the SBA's pre-existing industry size standard and alternative size standard, the applicant would nevertheless qualify for a First Draw loan if the applicant and its affiliates employed "not more than" "500 employees." 15 U.S.C. § 636(a)(36)(D)(i).

[6] At deposition, Imperative's corporate representative agreed that the alternative size standard was inapplicable to the Second Draw PPP. Ex. 1, Imperative Dep. 182:23-183:1 (Q. Does Imperative now acknowledge that the alternative size standard did not apply to the Second Draw PPP loan? A. Yes.).

6

Loans narrower than the eligibility requirements for First Draw PPP Loans. The Economic Aid Act generally provides that a borrower is eligible for a Second Draw PPP Loan only if it has 300 or fewer employees and experienced a revenue reduction in 2020 relative to 2019[.]").

### III.    Overview of the Complaint's Allegations Regarding Hastings

The Complaint alleges that Hastings drove Imperative's fraudulent loan application from inception to completion: Hastings "brought the Second Draw PPP loan opportunity to Imperative's attention, coordinated the data gathering for the loan application, reached out to lenders on Imperative's behalf, and served as the intermediary between Imperative and the lenders Imperative used to process the loan application." Cmplt. ¶ 7; *see also id.* ¶¶ 118–20.

The Complaint alleges that Hastings caused Imperative to make five separate false statements to the SBA: **(1)** that Imperative and its affiliates collectively had only 300 employees— "exactly the 300-employee limit needed to be eligible" for a Second Draw loan, *Id.* ¶ 67; **(2)** that Imperative was "eligible to receive a loan under the rules in effect at the time" and qualified under the alternative size standard, *Id.* ¶¶ 1, 6, 65, 77; **(3)** that Imperative had provided to the SBA "a complete list of entities affiliated with" Imperative in "full consideration to the affiliation requirements," despite the list omitting Hastings itself and multiple Hastings portfolio companies, *Id.* ¶¶ 6, 70–72, 130; **(4)** that Imperative and its affiliates had "at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020," *Id.* ¶¶ 1, 6; and **(5)** that the loan was "necessary to support [Imperative's] ongoing operations," despite Imperative being backed by Hastings, a large private equity firm with access to cash, *Id.* ¶¶ 1, 6, 108–12.

The Complaint also alleges *how* Hastings caused Imperative to make these false statements:

- "Hastings caused Imperative to report false information about Imperative's and its affiliates' tangible net worth and average net income in connection with Imperative's certification to the

7

SBA that Imperative qualified for the Second Draw loan under the SBA's alternate size standard." *Id*. ¶ 127

- "Imperative relied on Hastings to make the financial aggregation and determination of affiliates as part of Imperative's Second Draw PPP loan application." *Id*. ¶ 128
- "Imperative chose to rely on Hastings to make the calculation under the alternate size standard because Imperative did not have access to Hastings' portfolio companies' financial information in order to make that calculation itself." *Id*. ¶ 129.
- "Imperative was not privy to the corporate structure of Hastings and could not, on its own, determine Imperative's own affiliates." *Id*. ¶ 129.
- "Hastings provided Imperative a list purporting to be a 'complete list of' Imperative's affiliates but was in fact an incomplete list." *Id*. ¶ 130
- Despite receiving warning that Imperative was ineligible for the loan, "Hastings personnel directed that Imperative should nevertheless apply for the Second Draw loan." *Id*. ¶ 125.

TAB Bank, acting under the SBA's delegated authority, approved Imperative's Second Draw PPP loan for $2,000,000. *Id*. ¶ 86. The government paid TAB Bank a lender's processing fee in the amount of $20,000.00 *Id*. ¶ 87. On January 19, 2022, the government forgave 100% of Imperative's Second Draw PPP loan—including interest—in the amount of $2,013,611.11. *Id*. ¶ 88.

## ARGUMENT

I.     **The Government Has Article III Standing to Recover the Fraudulently Obtained Taxpayer Money**

Article III standing is a threshold jurisdictional question that asks whether the plaintiff has suffered an injury-in-fact that is fairly traceable to the defendant's conduct and redressable by a favorable ruling. *Ass'n of Cmty. Organizations for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999).

Hastings does not contest that the government[7] suffered an injury (monetary loss) or that the injury is redressable through money damages. Specifically, Hastings concedes that the loan application "cause[d] . . . the government to incur processing fees," and that these fees are a "loss

---

[7] The False Claims Act confers standing for Verity to "bring a civil action for a violation of [the FCA] . . . . in the name of the Government." 31 U.S.C. § 3730(b)(1).

the government sustained in approving the loan." Mot. at 7. That concession is fatal to Hastings' standing challenge. Once Hastings admits that the government suffered *any* loss—even processing fees—traceable to the Hastings-caused fraudulent loan application, standing is established.

Hastings argues primarily about the *magnitude* of the government's injury.[8] But the measure of damages—whether "the full loan amount," "processing fees," or civil penalties permitted under 31 U.S.C. § 3729(a)—is a fact-based merits question to be resolved at summary judgment or trial. It is not a threshold jurisdictional question. If the government sustained *a* loss— no matter how small—traceable to the Hastings-directed fraudulent loan application, then the government has standing to sue Hastings for damages. This is because "the injury in fact requirement under Article III is qualitative, not quantitative." *Fowler*, 178 F.3d at 357.

Hastings' cases say nothing different. In fact, *United States ex rel. Collins v. Robertson*, 2025 WL 2701061 (N.D. Ga. Aug. 18, 2025), on which Hastings relies, Mot. 6–7, makes abundantly clear that the government has standing here. In *Robertson*, the court considered, at summary judgment, "the appropriate measure of damages to the government." 2025 WL 2701061, at *6. The defendants had obtained PPP loans but, unlike here, "the loans were repaid by" the defendant and "[t]he government did not forgive the loans," so "[t]he only money paid out of public coffers was for the processing fees." *Id.* at *7. Even though the government's damages were limited to just the loan processing fees, there was never any question that the government had standing.

---

[8] *See* Mot. at 2 ("Relator's claims against Hastings (***as to the full amount*** of the forgiven loan plus interest) should be dismissed with prejudice under Rule 12(b)(1) for lack of Article III standing.") (emphasis added); Mot. at 5 (Verity lacks "Article III standing to recover ***the forgiven amount***.") (emphasis added); Mot. at 8 ("[T]he Court should dismiss Relator's claims (with respect to seeking recovery of the ***full amount of the forgiven loan***) under Rule 12(b)(1).") (emphasis added).

9

*United States ex rel. Relator LLC v. Riviera Financial LLC*, 2025 WL 1421265 (C.D. Cal. Feb. 6, 2025), which Hastings cites for the proposition that "traceability can be defeated" when the government does not forgive loan applications, has absolutely nothing to do with standing, much less the traceability element.[9] Mot. at 7. *Riviera* primarily involved a motion for summary judgment *on damages*, not a Rule 12(b)(1) motion to dismiss for lack of standing. Similar to *Robertson*, the court in *Riviera* granted summary judgment because the defendant "timely repaid the loan" and the government never forgave it, so the government "did not sustain any damages." *Id.* at *6. The relator in *Riviera* apparently did not seek recovery of processing fees; the opinion does not mention them one way or the other. Not only are *Riviera*'s facts miles apart from this case, but its legal analysis has nothing to do with the propositions for which Hastings cites the case—it was not a case about Article III standing at all. Same goes for *United States v. McNinch*, 356 U.S. 595 (1958), which Hastings cites. Mot. at 6. In *McNinch*, the Court held that "a lending institution's application for credit insurance under the FHA program is not a 'claim' as that term is used in the False Claims Act." *Id.* at 598. Like the other cases Hastings cites, *McNinch* has nothing to do with Article III standing. *McNinch* is further inapposite because in that case, the government "disburse[d] no funds," so the government did not suffer "financial detriment." *Id.* at 599.

The only Article III standing case Hastings cites substantively is *Turaani v. Wray*, 988 F.3d 313 (6th Cir. 2021), for the proposition that that a "third party's voluntary and independent actions" can break the causal chain and defeat standing. Mot. at 7. But there is no third party here. In *Turaani*, an FBI agent disseminated information about the plaintiff to a gun dealer, who then made the independent decision not to sell a gun to the plaintiff. 988 F.3d at 315. The plaintiff did not sue

---

[9] The words "standing," "Article III," or "traceability" do not even appear in the opinion.

the gun dealer but rather sued various officials at the FBI, arguing that the FBI violated his rights. *Id.* The Sixth Circuit concluded that the plaintiff lacked standing to sue the FBI agents because the gun dealer—a third party—took "voluntary and independent" action that led to the plaintiff's injury. *Id.* at 317. That case has no application here because there is no "third party" who took any "voluntary and independent actions." Trying to fit a square peg in a round hole, Hastings argues that "independent action *by the government*" resulted in the *government's* own injury. Mot. at 7 (emphases added). But that's not a standing argument; it is a *materiality* argument, which requires Hastings to show that the government had "actual knowledge" of the fraud and yet disbursed money anyway. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 195 (2016). Verity addresses Hastings' materiality argument in Section II.A, *infra*.

**II.     The Complaint Adequately Pleads the Challenged Elements of a False Claims Act Claim**

An FCA claim requires showing that a defendant made or caused to be made (1) "a false statement or fraudulent course of conduct; (2) with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due." *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (cleaned up). Hastings challenges only the materiality and causation elements.

**A.     The Complaint Adequately Pleads Materiality**

The False Claims Act defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). At the pleading stage, "a relator need not allege that the falsehood actually influenced the government's decision to pay—only that it had the potential to do so." *United States ex rel. Gomez v. Koman Constr., LLC*, 796 F. Supp. 3d 353, 374 (W.D. Tex. 2025) (citing *United States v. Marlin Med. Sols. LLC*, 579 F. Supp. 3d 876, 884 (W.D. Tex. 2022) and *Longhi*, 575 F.3d at 469–70).

11

When a Defendant's "violations are conditions of payment . . . 'it is certainly probative evidence of materiality.'" *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 161 (5th Cir. 2019) (quoting *United States ex rel. Rose v. Stephens Institute*, 909 F.3d 1012, 1020 (9th Cir. 2018)).

A defendant cannot defeat materiality merely by pointing to the government's subsequent payment. Materiality can be disproven through evidence that the government paid claims "despite its actual knowledge" of the defendant's submission of false claims. *Escobar*, 579 U.S. at 195. Even then, such actual knowledge is "not dispositive," *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 663 (5th Cir. 2017), and "does not necessarily preclude a finding of materiality," *United States ex rel. Campbell v. KIC Dev., LLC*, 2019 WL 6884485, at *10 (W.D. Tex. Dec. 10, 2019). In general, the question of "[a]t precisely what point . . . the Government acquired actual knowledge that it had been defrauded is a fact issue, inappropriate for resolution at the 12(b)(6) stage," and a motion to dismiss on this factual issue is generally "premature." *Id.* at *12.

Here, the Complaint adequately pleads materiality because each of the Hastings-caused false certifications went to *threshold eligibility requirements* for the Second Draw loan. *Lemon*, 924 F.3d at 161. The Complaint alleges that Hastings caused Imperative to falsely certify, in the Second Draw loan application, that: **(1)** Imperative "employs no more than 300 employees," Cmplt. ¶¶ 47, 67; **(2)** Imperative was "eligible to receive a loan under the rules in effect at the time," *Id.* ¶¶ 1, 6, 44, 65; **(3)** Imperative was providing a "complete list" of its affiliates, *Id.* ¶¶ 1, 6, 70–72; **(4)** Imperative and its affiliates collectively had at least a 25% reduction in gross receipts, *Id.* ¶¶ 1, 6, 66; and **(5)** the loan was "necessary to support the ongoing operations of" Imperative, *Id.* ¶¶ 1, 6, 108. Each of these certifications went to the heart of whether Imperative was entitled

12

to receive Second Draw PPP funds. The 300-employee cap and 25% gross receipts reduction were express statutory eligibility requirements. 15 U.S.C. § 636(a)(37)(A)(iv). The "complete list" of affiliates was required to determine compliance with those thresholds.[10] And the economic necessity certification was a condition of every PPP loan. *See* 15 U.S.C. § 636(a)(36)(G). An ineligible borrower could not receive, or have forgiven, a PPP loan.[11]

Hastings challenges the materiality of only *one* false statement—the number of employees disclosed in the loan application. *See* Mot. at 17.[12] Hastings argues that because Imperative disclosed its *true* number of employees *later* in its loan forgiveness application, and the government "decided to pay anyway," there can be no materiality as a matter of law. Mot. at 18. But Hastings has nothing to say about the numerous other false statements, none of which were even arguably disclosed in the loan forgiveness application. The unchallenged materiality of these other four false statements—each going to threshold eligibility requirements for the loan—is enough to deny the motion to dismiss. *Dammon v. Folse*, 846 F. Supp. 36, 39 (E.D. La. 1994) (denying motion to dismiss because defendant "fails to address the allegations in the amended complaint").

---

[10] Imperative's corporate representative admitted that Imperative failed to aggregate Imperative's gross receipts with the gross receipt's of Imperative's affiliates. Ex. 1, Imperative Dep. 153:23–154:7.

[11] *See* 15 U.S.C. § 636(a)(36)(J)(ii) (only an "eligible entity" shall be eligible for forgiveness); *see also* Business Loan Program Temporary Changes; Paycheck Protection Program-Requirements-Loan Forgiveness, 85 Fed. Reg. 33,004, 33,005 (June 1, 2020) (if "the borrower was ineligible for the PPP loan based on the provisions of the CARES Act, SBA rules or guidance available at the time of the borrower's loan application, or the terms of the borrower's PPP loan application (for example, because the borrower lacked an adequate basis for the certifications that it made in its PPP loan application), the loan will not be eligible for loan forgiveness"); SBA Procedural Notice No. 5000-20078, at 3 (Jan. 15, 2021) (if "a borrower was ineligible for any portion of its loan amount, forgiveness will be denied for the ineligible portion") (available at https://legacy.sba.gov/sites/default/files/2021-01/5000-20078-508.pdf).

[12] At deposition, Imperative's corporate representative admitted that this statement on its loan application was "a false statement." Ex. 1, Imperative Dep. 103:25-104:3. (Q. The number 300 appearing next to the number of employees is a false statement, correct? A. Yes.).

13

Yet even if this case were about the false employee-count certification *only*, Hastings' arguments would still fail. Hastings cannot demonstrate that the government had *actual knowledge* that Imperative falsified its employee count and yet made a conscious decision to waive the 300-employee limit set by statute, much less that anyone at the SBA who had such "actual knowledge" and made such a conscious decision had authority to contravene the plain text of the CARES Act. 15 U.S.C. § 636(a)(37)(A)(iv) (defining an "eligible entity" for the Second Draw PPP as one that "employs not more than 300 employees"). All Hastings does is point to the forgiveness application's statement of "433" employees. Ex. A-1 to Mot. (SBA Form 3508). From that alone, Hastings concludes that the government made an "informed decision to forgive" the loan. Mot. at 14, 21. There is no support for that conclusory argument. There is no evidence—and certainly none that can be established from the face of the Complaint—that any SBA reviewer actually *saw* that number, understood its significance, compared it to the 300-employee eligibility threshold, and nevertheless decided to waive the statutory eligibility requirements, let alone had the legal authority to do so. The "Forgiveness Calculation Form" is a dense, multi-page form. *See* Ex. A-1 to Mot. Its primary purpose is to calculate and document how the borrower spent the loan proceeds (a specific requirement for loan forgiveness), not to re-verify eligibility. The employee count appears buried among dozens of other data fields. Hastings' argument requires this Court to infer a level of government review that is not established in the record, contradicted by common sense, and directly contrary to the eligibility requirements Congress prescribed in the CARES Act. This "evidence" is well below what is required to meet *Escobar*'s "actual knowledge" standard. 579 U.S. at 195. At the very least, the argument is "premature" on this record. *Campbell*, 2019 WL 6884485, at *12.

14

These facts stand in stark contrast to the cases Hastings cites. Mot. at 18. In *United States ex rel. Harman v. Trinity Industries Inc.*, the Federal Highway Administration conducted a substantive review, *actually learned* of the precise deficiency forming the basis for the FCA claims, and made a deliberate decision to continue paying the claims. 872 F.3d 645, 663–65 (5th Cir. 2017). The relator's concerns "were rejected by FHWA in an official memorandum," at which time "the government was aware of all the charges of noncompliance," and the court emphasized that the government's decision to continue paying "was not made by a low-level bureaucrat, but rather by FHWA itself"—through a formal agency determination after full consideration of the fraud allegations. *Id.* at 664–65. Here, by contrast, the SBA (or the lender) processed a forgiveness application dense with data fields without any indication it understood Imperative was ineligible for the original loan. There was no agency memorandum, no official determination, and no evidence that anyone at the SBA—much less a high-up official—actually learned of the fraud before forgiving the loan.

Hastings' remaining out-of-circuit cases are further afield. In *United States ex rel. Bachert v. Triple Canopy, Inc.*, 321 F. Supp. 3d 613 (E.D. Va. 2018), the court found the alleged false claims immaterial because (1) the defendants' falsified records for only a "handful of weapons" which were "the kind of 'minor or insubstantial' noncompliance that *Escobar* advises are not material," *id.* at 619; (2) the alleged misconduct "accounted for only three-tenths of one percent of the total labor invoice to the government," *id.* at 620; and (3) the government "repeatedly renewed defendant's . . . Contract . . . every time it had the option to do so, even after it learned of [the relator's] allegations," *id.* at 621. None of those facts are present here. None of the Hastings-caused false certifications were minor; they were threshold statutory eligibility requirements. The

15

certifications were central to the entire $2 million loan, not a fraction of a percent. And there is no evidence that the SBA ever learned of the fraud and continued to pay anyway.

*United States ex rel. Bonzani v. United Technologies Corp.*, 662 F. Supp. 3d 217 (D. Conn. 2023), actually underscores the deficiencies in Hastings' argument. There, the court granted summary judgment—not a motion to dismiss—after a full evidentiary record established that the defendant's allegedly false claim was not "a condition of payment" and that the government "continued to pay . . . even after being made aware of [relator's] allegations and conducting an investigation." *Id.* at 229–30. Every distinguishing factor cuts against Hastings here. This case is at the pleading stage, not summary judgment, and Hastings has presented no evidence establishing what the SBA actually knew or when, much less that the government conducted an investigation before paying the forgiven amount. And the false claims here went to express conditions of loan eligibility codified in the CARES Act. 15 U.S.C. § 636(a)(37)(A)(iv).

Finally, Hastings cites *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822 (6th Cir. 2018), but that case supports Verity. There, the Sixth Circuit reversed dismissal and held that "[w]ithout actual knowledge of" the defendant's false claims, "the government's response to the claims submitted by the defendants . . . has no bearing on the materiality analysis." *Id.* at 834.[13] This is exactly the situation here: the fact that SBA forgave the Second Draw loan "has no bearing on the materiality analysis" because there is no evidence that the SBA had "actual knowledge" of Imperative's ineligibility for the loan.

---

[13] Hastings asserts that in *Prather*, "the court found the government's continued payment with knowledge of falsity is 'very strong evidence that those requirements are not material.'" Mot. at 18. That is simply incorrect. Hastings' quoted portion is from *Prather*'s block quote of *Escobar*, in which *Prather* simply articulates the relevant standard. *See* 892 F.3d at 833. The very next sentence after the block quote says: "Prather made no allegations regarding the government's past practice with respect to claims that the government knew[.]" *Id.*

16

### B.     The Complaint Adequately Pleads Causation

The FCA "employs traditional notions of proximate causation." *United States v. Corp. Mgmt., Inc.*, 78 F.4th 727, 741 (5th Cir. 2023). To establish causation, a plaintiff must adequately allege that a defendant's false statement "caused the government to pay out money or to forfeit moneys due." *Longhi*, 575 F.3d at 467. A false claim need not be the *sole* cause of the government's payment; it suffices that the false claim was "*a* proximate cause of the losses." *United States v. Hodge*, 933 F.3d 468, 475 (5th Cir. 2019) (emphasis added). Causation is established so long as "it was foreseeable that" the false statement would be presented to the federal government and be a "cause of the losses." *Id.*; *see also Longhi*, 575 F.3d at 473 (causation established where there was "a direct causal relationship . . . between the funds received by the Defendants and their false statements").

The Complaint charts a straightforward causal chain linking Hastings' conduct to the government's $2,033,611.11 loss. Hastings orchestrated a scheme in which Imperative falsely certified eligibility for a Second Draw PPP loan despite knowing Imperative was ineligible. The Hastings-caused false certifications were the direct, proximate, and *intended* cause of the loan's issuance; without them, TAB Bank would not have approved the loan and the SBA would not have guaranteed it. Without the loan's issuance and the SBA's guarantee, the federal government would not have been in a position to forgive the loan or pay TAB Bank a processing fee. Cmplt. ¶¶ 87, 118–25, 139–57. The Complaint walks through each step of the fraudulent scheme:

- Hastings "brought the Second Draw PPP loan opportunity to Imperative's attention," *Id.* ¶¶ 7, 119;
- Hastings "directed Imperative Chemical Partners Inc. to apply for its Second Draw PPP loan," *Id.* ¶¶ 7, 118;
- Hastings "reached out to lenders on Imperative's behalf," *Id.* ¶¶ 7, 119;
- Hastings "connected Imperative with a lender to process Imperative's Second Draw PPP loan application," *Id.* ¶¶ 143, 155;

17

- Hastings "served as the intermediary between Imperative and the lenders Imperative used to process the loan application," *Id.* ¶¶ 7, 120;
- Hastings "coordinated the data gathering for the loan application," *Id.* ¶¶ 7, 119;
- Hastings "created certain of the false certifications Imperative made, including creating a list purporting to be a 'complete list of' Imperative's affiliates, which was in fact an incomplete list," *Id.* ¶ 151;
- Hastings "caused Imperative Chemical Partners Inc. to make false statements to the SBA," *Id.* ¶ 7; and
- "But for Imperative's knowingly false records and statements, the lender would not have issued the loan and the SBA would not have forgiven it." *Id.* ¶¶ 135, 150.

These allegations establish a textbook causal chain: Hastings caused false statements to be submitted → those false statements induced approval of the loan → the SBA guaranteed the loan based on those same false certifications → and the SBA ultimately forgave the loan, paying out over $2 million in federal funds.

The government's forgiveness of the loan flows proximately from the fraudulent loan application under "traditional notions of proximate causation." *Corp. Mgmt.*, 78 F.4th at 741. PPP loan forgiveness is an integral component of the PPP loan program and is directly dependent on loan approval. Indeed, eligibility for the loan is a condition of forgiveness. *See* 15 U.S.C. § 636(a)(36)(J)(ii) (only an "eligible entity shall be eligible for forgiveness); *see also* 85 Fed. Reg. 33,004, at 33,005 (June 1, 2020) (if "the borrower was ineligible for the PPP loan based on the provisions of the CARES Act, SBA rules or guidance available at the time of the borrower's loan application, or the terms of the borrower's PPP loan application (for example, because the borrower lacked an adequate basis for the certifications that it made in its PPP loan application), the loan will not be eligible for loan forgiveness"); SBA Procedural Notice No. 5000-20078, at 3 (Jan. 15, 2021) (if "a borrower was ineligible for any portion of its loan amount, forgiveness will be denied for the ineligible portion").[14] Thus, forgiveness was not merely a foreseeable result—it

---

[14] SBA Procedural Notice No. 5000-20078 is available at https://legacy.sba.gov/sites/default/files/2021-01/5000-20078-508.pdf.

18

was the *intended outcome* of the loan application. Hastings orchestrated every step of the fraud: it brought the Second Draw PPP opportunity to Imperative's attention, received three warnings from PNC Bank that the loan was improper, directed Imperative to proceed anyway, shopped for TAB Bank as a more compliant lender, prepared the false affiliates list, and caused Imperative to submit both the origination and forgiveness applications. Cmplt. ¶¶ 118–25. The government's forgiveness was the culmination of the fraud, the intended and entirely foreseeable result.

Resisting this straightforward chain of causation, Hastings rehashes its materiality arguments. It argues that "the governments' (*sic*) forgiveness of the loan was not predicated on Imperative's *loan* application, but rather on its *forgiveness* application." Mot. at 1–2. And because Imperative's loan forgiveness application allegedly disclosed Imperative's time-of-application employee count, and the government forgave the loan "anyway," the misrepresentations on the original loan application did not "cause" the government's loss. Mot. at 6–7, 12–13. This argument fails.

**First,** like the materiality arguments, Hastings focuses exclusively on "the Alleged *Employee-count Misrepresentation* on the Loan Application" and ignores all the other independently actionable false statements. Mot. at 6, 14–15 (emphasis added).[15] The Complaint alleges that Hastings caused Imperative to make *four other false statements* in the Second Draw loan application, and Hastings does not address any of them or challenge the direct causal chain applicable to them. *See* pp. 12–13, *supra*. Because the Complaint adequately alleges causation with respect to each of these other false statements, and Hastings has not even attempted to negate

---

[15] *See also* Mot. at 14 (arguing lack of causation from "any false claim in Imperative's loan application *as to its employee count*") (emphasis added); *id.* at 14 (arguing "Relator cannot establish Imperative's alleged *employee-count misrepresentation* on its loan application proximately caused the government's payment of the loan amount") (emphasis added); *id.* at 18 (asserting that "the forgiveness application states *an employee count* over 300, yet the government forgave the loan anyway") (emphasis added).

19

it, Hastings' causation arguments fail. *Dammon*, 846 F. Supp. at 39 (denying motion to dismiss because defendant "fails to address the allegations in the amended complaint"). This ends the inquiry over causation.

**Second**, even if this case were limited to just the one false statement on which Hastings focuses, Hastings' argument requires the Court to make an impermissible factual finding at the pleading stage. Hastings' argument rests on the premise that the SBA made an "*informed decision to forgive*" the loan with full knowledge of *all* of the Hastings-caused misrepresentations. Mot. at 14, 20. But whether the SBA was aware of Hastings' fraud, even just the falsified employee count, when it processed the forgiveness application is a contested factual question. It is not a legal conclusion this Court can draw from the face of the Complaint. As explained in Section II.A, *supra*, Hastings must show the government's "actual knowledge" to defeat materiality as a matter of law. *Escobar*, 579 U.S. at 195. For the reasons already explained, Hastings has come nowhere near meeting that standard. The far more plausible inference—and the one the Court *must* accept at the pleading stage—is that the SBA forgave the loan *precisely because* it was deceived by the Hastings-caused fraud, not because it made an "informed decision" to overlook it.

**Third**, Hastings tries to fit a square peg into a round hole by relying on cases where a third party's voluntary and independent actions severed the causal chain leading to the plaintiff's harm. But the only "third party" Hastings identifies here *is the plaintiff itself*: the government. Mot. at 6–7, 13–14.[16] Hastings effectively argues that the government falling victim to Hastings' fraud is an

---

[16] As explained, in *Turaani* the plaintiff alleged that FBI agents caused his injury by disseminating information that led a firearms dealer to refuse to sell him a firearm. 988 F.3d at 315–16. And *Texas Carpenters Health Benefit Fund v. Philip Morris, Inc.* involved union health benefit funds suing tobacco companies to recover the medical costs of treating smokers. 21 F. Supp. 2d 664, 666–67 (E.D. Tex. 1998). Both cases turned on the presence of genuinely independent third parties exercising their own judgment leading to the plaintiffs' injuries. Here, by contrast, the SBA was not an independent third party but the intended victim of the alleged fraud, and its loan-forgiveness decision was directly induced by the fraud rather than independently undertaken.

independent intervening act that breaks the chain of causation. That is nothing more than a repackaged version of the materiality argument refuted in Section II.A, *supra*.

Hastings' reliance on *Brunswick Bank & Trust Co. v. United States*, 707 F.2d 1355 (Fed. Cir. 1983), only underscores why its attempts to distort the causal chain fail. *Brunswick* explains that, in the context of government-guaranteed loans, there are two categories of misrepresentations: "primary" and "secondary." *Id.* at 1365. Primary misrepresentations are those that "induce the government" to enter the transaction in the first place—here, to approve the loan. *Id*. Secondary misrepresentations are those made "after" the loan "is issued and are about the actual claim for reimbursement." *Id.* FCA liability attaches to primary misrepresentations if those misrepresentations would have been "sufficient to void the" issuance of the loan or affect a "legal right to reimbursement" of that loan. *Id.* Here, the misrepresentations in the PPP loan application are paradigmatic actionable primary misrepresentations because they induced the government to approve a loan it otherwise would not—indeed, by statute, *could not*— have approved. Thus, under *Brunswick*'s framework, Hastings' fraud at the loan-application stage is fully actionable because it corrupted the government's decision to issue the loan itself.

**Fourth**, Hastings' policy arguments are meritless. The government is not seeking "double recovery" here, Mot. at 15, only recovery of the actual damages the United States sustained because of Defendants' fraud (trebled, of course, per statutory requirement). Hastings mischaracterizes this case as a "mere regulatory violation"[17] or "ordinary contractual dispute"[18]

---

[17] *United States ex rel. Hopper v. Anton*, on which Hastings relies, involved a "lack of a false claim" because the defendant had merely violated a regulation and "regulatory compliance was not a *sine qua non* of receipt of state funding." 91 F.3d 1261, 1267 (9th Cir. 1996). The *Hopper* court expressly differentiated its facts from those present here: "actionable false certifications upon which funding is conditioned." *Id.*

[18] Unlike *United States ex rel. Owens v. First Kuwaiti General Trading & Contracting Co*, on which Hastings relies, Hastings is not a federal contractor, and the United States is not suing over "good faith disagreements over matters of commercial judgment." 612 F.3d 724, 734 (4th Cir. 2010). The relator in *Owens* was unable to "establish a false claim," *id.* at 729, but the loan application here is unmistakably a false claim.

21

amenable only to administrative remedies. Mot. at 15–16.[19] Not so; this is a classic False Claims

Act case. Hastings orchestrated a scheme to obtain over $2 million from the federal government

through false certifications, and the government seeks to recover the resulting damages (trebled).

That is precisely what the FCA was designed to address.

**III.      The Complaint Satisfies Rule 9(b)**

**A.       Applicable Law**

Under Rule 9(b), a plaintiff "must state with particularity the circumstances constituting

fraud." Fed. R. Civ. P. 9(b). This means alleging the "the who, what, when, where, and how of the

alleged fraud." *United States ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 689, 693

(W.D. Tex. 2007) (cleaned up).

Rule 9(b) does not require a complaint to identify the specific "person who actually

submitted the" false statements. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190

n.31 (5th Cir. 2009); *see also Gomez*, 796 F. Supp. 3d at 376 ("Rule 9(b)'s 'who' requirement may

be satisfied by identifying the responsible business entity; relators need not name the specific

individuals who drafted or submitted the claim.").

Nor does Rule 9(b) require "including all the details of any single court-articulated

standard—it depends on the elements of the claim at hand." *Grubbs*, 565 F.3d at 188. Rather, a

complaint "may nevertheless survive by alleging particular details of a ***scheme*** to submit false

claims paired with reliable indicia that lead to a strong inference that claims were actually

submitted." *Id.* at 190 (emphasis added). This is because the "pleading requirements are relaxed

---

[19] It is unclear what point Hastings intends to make by citing a document titled *SBA's Actions to Address Forgiven PPP Loans Subsequently Flagged as Potentially Ineligible*. *See* Mot. at 16 n.3. To the extent Hastings argues that the government is recovering fraudulently obtained loans through administrative procedures only, that is incorrect. On March 16, 2026, the President issued an Executive Order directing the Attorney General to "take appropriate action to promote the meritorious pursuit by private persons of civil actions under 31 U.S.C. 3730 [The False Claims Act] concerning fraud within Federal benefit programs." *Establishing the Task Force To Eliminate Fraud*, 91 Fed. Reg., 13485, 13488 (Mar. 15, 2026).

where the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge," and a central purpose of the rule is to "provide defendants with fair notice of a plaintiff's claims." *Lam*, 481 F. Supp. 2d at 696–97.

### B.    Application

The Complaint meets the Rule 9(b) standard with room to spare. Verity alleges that Hastings (*the who*) caused Imperative to make at least five false statements (*the what*)[20] on its SBA Form 2483-SD and attached addendum (*the where*) leading up to the approval of Imperative's Second Draw PPP loan application in May 2021, and culminating in forgiveness on January 19, 2022 (*the when*). Cmplt. ¶¶ 86, 88; *see also id.* ¶¶ 118–30. The Complaint also alleges *how* Hastings caused Imperative to make these false statements: bringing "the Second Draw PPP loan opportunity to Imperative's attention, coordinat[ing] the data gathering for the loan application, reach[ing] out to lenders on Imperative's behalf, and serv[ing] as the intermediary between Imperative and the lenders Imperative used to process the loan application." *Id.* ¶ 7. The Complaint provides even more specificity as to *the how*:

- "Hastings caused Imperative to report false information about Imperative's and its affiliates' tangible net worth and average net income in connection with Imperative's certification to the SBA that Imperative qualified for the Second Draw loan under the SBA's alternate size standard." *Id.* ¶ 127
- "Imperative relied on Hastings to make the financial aggregation and determination of affiliates as part of Imperative's Second Draw PPP loan application." *Id.* ¶ 128
- "Imperative chose to rely on Hastings to make the calculation under the alternate size standard because Imperative did not have access to Hastings' portfolio companies' financial information in order to make that calculation itself." *Id.* ¶ 129.
- "Imperative was not privy to the corporate structure of Hastings and could not, on its own, determine Imperative's own affiliates." *Id.* ¶ 129.

---

[20] Those five false statements are that Imperative (1) "employs no more than 300 employees," Ex. 12, TAB-0000162; Cmplt. ¶ 67; (2) was "eligible to receive a loan under the rules in effect at the time," Ex. 12, TAB-0000162; Cmplt. ¶¶ 1, 6, 65, 77; (3) provided a "complete list of entities affiliated with the applicant," which Hastings "created," Ex. 11, IMPERATIVE-0000015; Cmplt. ¶¶ 70–72, 130, 151; (4) had "at least a 25% reduction in gross receipts" together with its affiliates, Ex. 12, TAB-0000160, 162, 164; Cmplt. ¶¶ 1, 6, 66; and (5) that the loan was "necessary to support the ongoing operations" of Imperative, Ex. 12, TAB-0000160, 162, 164; Cmplt. ¶¶ 1, 108–12.

23

- "Hastings provided Imperative a list purporting to be a 'complete list of' Imperative's affiliates but was in fact an incomplete list." *Id.* ¶ 130
- Despite receiving warning that Imperative was ineligible for the loan, "Hastings personnel directed that Imperative should nevertheless apply for the Second Draw loan." *Id.* ¶ 125.

These allegations sufficiently allege the "particular details of a scheme to submit false claims," *Grubbs*, 565 F.3d at 190. Hastings cannot credibly argue that it lacks "fair notice" of the claims against it. *Lam*, 481 F. Supp. 2d at 696.

Contrary to Hastings' arguments, these allegations do not reflect Hastings' "passive conduct." Mot. at 11. Hastings cites cases holding that a parent entity is not automatically liable under the FCA for its subsidiary's conduct merely by virtue of ownership and oversight. Mot. at 9–10. That legal principle is correct—but it has nothing to do with this case. This is not an alter ego case, and Verity does not seek to hold Hastings liable merely because it owns Imperative. This case is about Hastings' *direct participation* in orchestrating fraud from start to finish. The Complaint provides exactly the kinds of allegations showing "hallmarks of overall integration" between Hastings and Imperative, and Hastings' "interfere[ce] with the subsidiary's operations in a way that surpasses the control exercised by a parent as an incident of ownership," as required by *Lozada-Leoni v. MoneyGram International, Inc.*, 2020 WL 7000874, at *22–23 (E.D. Tex. Oct. 19, 2020), which Hastings cites, Mot. at 9–10. The Complaint alleges that Hastings initiated the fraudulent scheme by directing Imperative to apply for a loan Hastings knew Imperative was ineligible for; received three separate warnings from PNC Bank that Imperative was ineligible; responded to those warnings by shopping for a more compliant lender; created a false "Addendum A" that concealed the true scope of Imperative's affiliations; and coordinated the data gathering for the loan application. Cmplt. ¶¶ 1, 7, 118–25.  And when asked whether to proceed despite three explicit rejections, Hastings' own Managing Director, Joe Conlon, gave the order to "get the cash

24

and deal with it later." Ex. 10, IMPERATIVE-001626. That's not passive ownership; it is active fraud.

Hastings faults the Complaint for not naming specific Hastings individuals. Mot. at 9–11. But Rule 9(b) does not require naming individuals—it requires only that the complaint identify the responsible entity and provide fair notice of the fraud. *See Grubbs*, 565 F.3d at 190 n.31; *Gomez*, 796 F. Supp. 3d at 376. Verity did not name all individuals in the Complaint—the first to include Hastings as a defendant—because it saw no reason to call out employees by name in a public filing at this stage of the lawsuit when the Complaint already identifies the corporate entity responsible, and Hastings' production and Imperative's deposition testimony makes clear who the relevant individuals are. But since Hastings demands names, Verity will oblige. The section below identifies every Hastings individual involved, their specific conduct, and the documents and testimony supporting each allegation, based on the evidence available to date (discovery is ongoing). These facts can be added to the Complaint if the Court requires additional particularity.

**January 13–14, 2021: Kathryn Cantlon Viotto Initiates the Scheme.** On January 13, 2021, Kathryn Cantlon Viotto of Hastings emailed Imperative's CFO Ron Thomason, directing Imperative to apply for a Second Draw PPP loan. Ex. 4, IMPERATIVE-001367. Thomason immediately recognized Imperative's ineligibility and asked "What about the 300 employee limit?" *Id.* Cantlon Viotto assured him that "[t]here is an alternative size test that we qualified under last time—the eligibility rules are the same this time as well so it negates the 300 employee limit." *Id.* As explained, this was false: the alternative size standard was not available for Second Draw loans. 15 U.S.C. § 636(a)(37)(A)(iv); Ex. 3, VERITY-0010268 (FAQ #63); *see* pp. 6–7, *supra*.

25

**January 21–25, 2021: PNC Bank Warns Cantlon Viotto, Conlon, and Thomason Three Times.** Imperative initially connected with PNC Bank to process the Second Draw loan. PNC refused. On January 21, 2021, PNC notified Cantlon Viotto and Thomason: "Imperative does not qualify for the 2nd draw PPP2 loan based on the employee count. We cannot accept the alternative size standard . . . as that does not apply for the PPP2 eligibility criteria." Ex. 5, IMPERATIVE-001622. Cantlon Viotto of Hastings "took the primary lead" in pushing back. Ex. 1, Imperative Dep. 185:14–186:1. That evening, PNC warned Cantlon Viotto and Thomason again, stating that "[t]here are different rules for the first round and second round PPP loans . . . . *The rule is 300 employees; we cannot accept an alternative size standard.*" Ex. 6, IMPERATIVE-001470. Cantlon Viotto continued to push back. *Id.*

After PNC Bank's two warnings, Hastings executive Conlon emailed Cantlon Viotto and Thomason with an email containing the subject line, "upon further review…" Ex. 7, IMPERATIVE-001637. Conlon wrote: "I assume Imperative alone is 453 employees? If so, then . . . . [w]e may need further clarification on Imperative." *Id.*

On January 25, PNC warned Cantlon Viotto and Thomason a *third* time: "The borrower application for second draw loans does not permit a borrower to select either of the two SBA size tests that are available on the first draw application (so we are unable to submit applications that don't meet the 300 employee restriction). *Based on this Imperative does not qualify for round 2 of the PPP program.*" Ex. 5, IMPERATIVE-001619 (emphasis added).

**January 13–26, 2021: Hastings Shops for a New Lender.** Even as Hastings kept pressing PNC to process the loan, Hastings began shopping for a different lender—one unaware of PNC's refusals. Hastings landed on TAB Bank. On January 13, 2021, Cantlon Viotto of Hastings emailed Michael Coburn of TAB Bank, stating "By way of introduction, I am *Kathryn Cantlon with*

26

*Hastings and will be assisting our companies in this next round of PPP*." Ex. 8, IMPERATIVE-0000006 (emphasis added). The Hastings executive did not even copy an Imperative executive on this initial communication regarding Imperative's loan. On January 22, Cantlon Viotto emailed TAB Bank: "I wanted to check with you on TAB's view on eligibility . . . We have gotten mixed responses from banks." Ex. 9, IMPERATIVE-001371. She did not disclose PNC's rejections.

On January 25, 2021—after PNC Bank had already warned Hastings and Imperative three times about Imperative's ineligibility for the Second Draw Loan—TAB Bank responded and informed Hastings that it has "been directed to not consult on eligibility." Ex. 9, IMPERATIVE-001371. In other words, TAB Bank told Hastings that, *unlike* PNC Bank, TAB Bank would not offer any view on whether Imperative was eligible; TAB Bank would simply process the application, just as Hastings wanted.

The same day, which was the same day PNC Bank issued its third warning to Imperative and Hastings, Cantlon Viotto emailed her colleagues, Thomason and Conlon: "if PNC comes back today and still says we aren't eligible . . . we could submit through TAB." *Id.*

**January 26, 2021: "Get the Cash and Deal with It Later."** On January 26—the day after PNC's third warning—Cantlon Viotto forwarded PNC's third rejection to Hastings Managing Director Joe Conlon, asking: "proceed with TAB today?" Conlon's response: ***"I would rather get the cash and deal with it later[.]"*** Ex. 10, IMPERATIVE-001626.

**Imperative Submits the Application Containing Hastings-Created False Statements.** Hastings created "Addendum A" for Imperative to submit with its PPP loan application. Ex. 1, Imperative Dep. 163:8–19 ("[T]he original creator [of Addendum A] was someone inside Hastings."). Addendum A falsely stated that Imperative was a "small business concern" under the "alternative size standard" and purported to contain "a complete list of entities affiliated with"

27

Imperative. Cmplt. ¶¶ 71, 77; Ex. 11, IMPERATIVE-0000015. Addendum A omitted Hastings itself and multiple Hastings portfolio companies. Cmplt. ¶ 72. Imperative claims it submitted Addendum A with its Second Draw loan application.

**Imperative's Admissions Regarding Hastings' Role.** Imperative's 30(b)(6) corporate representative repeatedly admitted that Hastings caused Imperative to submit the fraudulent loan application. The corporate designee admitted that Imperative "**needed clearance from Hastings**" to certify eligibility, Ex. 1, Imperative Dep. 91:18–21, and "relied on Hastings to make the financial aggregation and determination of affiliates," *id.* at 90:15–20. When asked whether Imperative performed the required financial analysis, the witness pointed the finger at Hastings:

> Q Did Imperative aggregate its tangible net worth with the tangible net worths of other Hastings portfolio companies when submitting its second draw PPP loan?
> MR. SOWDER: Objection; form.
> A The answer to the question is no. Imperative did not aggregate any of its financial information.
> Q (BY MR. BAR-ON) Did anyone else?
> A In order to go through the tan- -- the alternate size test, **that calculation had to be done by Hastings**. So it's not a calculation the company or Imperative's employees could conduct on its own.
> Q So Imperative relied on Hastings to make the calculation under the alternate size standard?
> MR. SOWDER: Objection; form.
> A Yes.
> Q (BY MR. BAR-ON) That's because Imperative did not have access to the financial information in order to make that calculation itself[?]
> MR. SOWDER: Objection; form.
> A Not just the financial information. **We also didn't know the affiliation conditions or any of the fund information. That's not information we were privy to.**
> Q (BY MR. BAR-ON) So Imperative relied on Hastings to make the financial aggregation and determination of affiliates as part of Imperative's second draw PPP loan application?
> MR. SOWDER: Objection; form.
> A Yes.

Ex. 1, Imperative Dep. 89:18–90:20.

28

**May 2021–January 2022: The Loan Is Approved and Forgiven.** In May 2021, TAB Bank approved Imperative's Second Draw PPP loan for $2,000,000. Cmplt. ¶ 86. TAB Bank's 30(b)(6) representative testified that TAB Bank would not have approved the loan had Imperative not signed the application certifying its eligibility. Ex. 2, TAB Dep. 361:17–362:7. On January 19, 2022, the SBA forgave 100% of the loan—including interest—in the amount of $2,013,611.11. Cmplt. ¶ 88.

*         *         *

There is no question who at Hastings participated in the fraud, what they did, when they did it, where the false statements were submitted, and how the scheme succeeded (though further discovery may provide yet more information on all of this). The Complaint already provides far more particularity than Rule 9(b) requires; Hastings knows exactly what it is accused of doing. Yet if specific names are required, Imperative respectfully asks to further amend the complaint to add in the above detail.

## IV.    The Government's Opposition to the Public Disclosure Bar Forecloses Hastings' Arguments

After Hastings filed its Motion, the government filed a "Renewed Notice of Opposition to Dismissal on the Basis of the Public Disclosure Bar." ECF No. 84. That opposition is dispositive. *See* 31 U.S.C. § 3730(e)(4)(A) (bar does not apply if "opposed by the Government"). The plain language of the statute grants the government absolute discretion to oppose the bar, with no qualifications or limitations. Hastings cites no case imposing any temporal or substantive limits on that discretion because none exists. The statute contains no deadline for the government's opposition, and Hastings cites no authority for imposing one. The government's opposition does not implicate due process or laches, for the reasons in the government's notice. *See* EFF No. 84.

Hastings had no vested right to dismissal under the bar; it had only the *possibility* of

29

invoking an affirmative defense that Congress expressly made subject to the government's opposition. And here, the government exercised the statutory authority Congress gave it. That is the end of the inquiry.[21]

## V.        If Any Pleading Deficiencies Exist, Dismissal Should Be Without Prejudice

If the Court finds any pleading deficiency, it should grant Verity leave to amend. *Hickson v. St. David's Healthcare P'ship, L.P., L.L.P.*, 168 F.4th 282, 292 (5th Cir. 2026) (finding dismissal with prejudice plain error where "deficiencies are factual and possibly curable"); *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) ("[A] plaintiff's failure to meet the specific pleading requirements [of Rule 9(b)] should not automatically or inflexibility result in dismissal of the complaint with prejudice to re-filing."). Dismissal with prejudice would be disproportionate to any technical pleading defect, particularly where Verity has demonstrated a meritorious claim supported by overwhelming documentary and testimonial evidence, the United States has twice opposed the public disclosure bar, and Hastings will suffer no prejudice from allowing Verity to cure any deficiency. Although the current operative complaint is the third amended complaint, it is the first version of the complaint to add Hastings as a defendant. This would thus be only the first amendment to add additional allegations addressing Hastings' liability.

## CONCLUSION

For the foregoing reasons, Verity respectfully requests that the Court deny Hastings' Motion to Dismiss.

Dated: August 6, 2026                    Respectfully submitted,

                                         **SUSMAN GODFREY LLP**

                                         By */s/ Shauli Bar-On*

---

[21] Verity also disputes that the public disclosure bar is applicable on these facts, because the challenged sources do not fit within 31 U.S.C. § 3730(e)(4)(A)'s enumerated channels.

Steven M. Shepard
Stephen Shackelford, Jr. (pro hac vice)
Shauli Bar-On (pro hac vice)
**SUSMAN GODFREY LLP**
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sshepard@susmangodfrey.com
sshackelford@susmangodfrey.com
sbar-on@susmangodfrey.com

*Attorneys for Plaintiff/Relator Verity Investigations,
LLC*

31

## INDEX OF EXHIBITS

*Highlighting was added by Verity's counsel.*

**Ex. 1**   Excerpts of Deposition of Imperative Chemical Partners, Inc. (30(b)(6) Corporate Representative Ron Thomason)

**Ex. 2**   Excerpts of Deposition of TAB Bank (30(b)(6) Corporate Representative Alex Crowley)

**Ex. 3**   SBA Frequently Asked Questions, Mar. 3, 2021, VERITY-0010240–69

**Ex. 4**   Email from K. Cantlon Viotto (Hastings) to R. Thomason (Imperative), Jan. 14, 2021, IMPERATIVE-001366–68

**Ex. 5**   Email from PNC Bank, Jan. 21–26, 2021, IMPERATIVE-001619–25

**Ex. 6**   Email from A. Puligandla (PNC Bank), Jan. 21, 2021, IMPERATIVE-001470–74

**Ex. 7**   Email from J. Conlon (Hastings), Jan. 21, 2021, IMPERATIVE-001637

**Ex. 8**   Emails re: Hastings Finding New Lender, Jan. 13–26, 2021, IMPERATIVE-0000005–06

**Ex. 9**   Email from K. Cantlon Viotto (Hastings) to TAB Bank and Forwarded to Hastings/Imperative Colleagues, Jan. 22–25, 2021, IMPERATIVE-001371–72

**Ex. 10** Email from J. Conlon (Hastings) "I would rather get the cash and deal with it later," Jan. 26, 2021, IMPERATIVE-001626–33

**Ex. 11** "Addendum A," IMPERATIVE-0000015

**Ex. 12** Imperative Second Draw PPP Loan Application (SBA Form 2483-SD), TAB-0000160–67

**CERTIFICATE OF SERVICE**

I certify that on August 6, 2026 a true and correct copy of the foregoing document and accompanying exhibits was served on counsel of record via CM/ECF.

*/s/ Shauli Bar-On*
Shauli Bar-On